The WELCH SCIENTIFIC COMPANY, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 132, Docket 28936.

United States Court of Appeals Second Circuit.

Argued Nov. 16, 1964.

Decided Jan. 14, 1965.

Rehearing Denied Feb. 3, 1965.

Albert X. Bader, Jr., New York City (Edward L. Coffey, Paul K. Rooney, and Simpson, Thacher & Bartlett, New York City, on the brief), for petitioner.

Michael N. Sohn, Attorney, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Solomon I. Hirsh, Attorney, N. L. R. B., Washington, D. C., on the brief), for respondent.

Before MEDINA, MOORE and MARSHALL, Circuit Judges.

MEDINA, Circuit Judge:

Petitioner, a manufacturer and distributor of educational and scientific materials, is an Illinois corporation with its main office and four plants located in Chicago. In 1937, when petitioner operated but one plant in Chicago, it entered into an "open shop" collective bargaining agreement with Local 325 of the Paper Makers Union. Four years later, the agreement was modified to cover "The Welch Scientific Company, of Chicago, Illinois, and its subdivisions and subsidiaries." Every subsequent agreement between petitioner and Local 325 has contained this coverage clause, including a two-year contract executed on May 6, 1963 and effective from July 1, 1963. Since 1941, contracts with Local 325 have provided that Welch "agrees to recognize and to bargain collectively with [Local

325] * * * as the sole collective-bargaining agent for all employees of the Company * * *."

In 1961, Welch, seeking to obtain outlets on the East and West Coasts, established a branch in San Carlos, California. In April 1962, Welch purchased the New York Scientific Supply Company, a more specialized operation, producing biological models and scales. The New York plant is the principal subject of the Board order before us for review.

Between April 1962 and April 1963, New York Scientific continued to operate under its old name at its old location. In April 1963, the New York branch moved to its present larger quarters under the name of Welch Scientific Company. The new facilities were capable of handling the warehouse and service functions that Welch wished to add to the production activities previously carried on by New York Scientific. While a substantial portion of the affairs of the New York operation was conducted by the Chicago office, Welch retained the former owners of New York Scientific, Rubinger and Cohn, to manage the New York plant. The managers were given authority to hire and discharge employees. Some supervisory personnel were transferred from Chicago to New York and several new employees were added to the previous complement of approximately 14 workers at the New York plant.

With these essentially undisputed facts as a background, we turn to the conduct found by the Board to have violated the National Labor Relations Act. In April 1962, when Welch bought New York Scientific, Rubinger was supplied with information and booklets describing Welch's pension, profit-sharing and hospitalization plans, which were independent of the agreement with Local 325, and Rubinger was instructed to distribute this material to the New York employees. Though Rubinger had been told about the contract with Local 325, no information about the union or the agreement was provided the employees as a whole until much later on. In the meantime, however, Welch paid wages and sick benefits and established holidays and vacations in accordance with the agreements negotiated with Local 325, and on several occasions the company informed individual employees that it was doing so because it considered the agreements applicable to the New York plant.

During June 1963, Local 2682 of the Union Brotherhood of Carpenters & Joiners, AFL–CIO, began an attempt to organize the New York employees, who had never during the forty years of New York Scientific's existence been represented officially by any union. A meeting of Local 2682 was held on Monday evening, June 24, 1963, and the Local's president, Prezioso, announced that he would telephone the company at about 11 o'clock the next morning to request recognition. Prezioso called Rubinger at about 11:30 A.M., Tuesday, June 25, and arranged a meeting for Friday, June 28. Local 325 was not mentioned during the conversation between Prezioso and Rubinger. Shortly after the telephone call, Prezioso filed a representation petition with the Board.

On June 25 and June 26, Rubinger briefly asked each employee, individually and at the employee's customary place of work, whether or not he had joined Local 2682. Each employee's answer was checked off by Rubinger on a list of employees that he carried with him.

At 5:30 P.M. on June 25, an employee, Abraham Axelrod, was discharged by the company. We shall have more to say about this phase of the case later, as the Board found that Axelrod was discharged for participation in union activities and entered its customary order of reinstatement and back pay.

On June 28, Rubinger told Local 2682's representatives that he could not recognize or bargain with them as the contract with Local 325 already covered the New York employees. Subsequently, the company informed Local 325 of Local 2682's organizational effort.

On July 8, Richard Welch, Jr., vice president and treasurer of the company, appeared at the New York plant and

spoke to small groups of employees. Welch told the employees that they had been and were covered by contracts with Local 325 and were entitled to all their terms and benefits, including a five cent an hour raise contained in the agreement executed May 6, 1963 and effective July 1, 1963. With the exception of one employee who received a vacation paycheck on June 28 which included the raise, the employees had no prior knowledge of the negotiations carried on in their behalf by Local 325 or the terms of the agreement that supposedly covered them. The vice president also distributed copies of the latest contract to the employees.

Eight days later, on July 16, an organizer for Local 325 came to the New York plant and requested Rubinger's permission to solicit memberships. Permission was granted, and the organizer was introduced to one of the employees by a foreman who left immediately after the introduction. This was the first contact between Local 325 and the New York employees.

An unfair labor practice charge was filed by Local 2682 on July 15, 1963, while the representation proceeding instituted by Local 2682 on June 25 was still pending. The Regional Director's decision directing an election was handed down on August 6, 1963. Welch's twin claims of contract bar and accretion were rejected by the Regional Director, the first as the 1961–1963 contract "was not applied" to the New York employees and the petition preceded the effective date, July 1, of the 1963–1965 contract, and the second on the ground that the "New York plant is a new operation and not just an accretion to the existing unit." The election, conducted on January 24, 1964, resulted in a victory for Local 325. The Regional Director, however, set aside the election on September 25, 1964, because of the company's pre-election activities previously discussed, and ordered a new election. We were informed at oral argument by counsel for Welch that Local 325 will not participate in this election.

The General Counsel's unfair labor practice complaint was issued on August 30, 1963. The complaint alleged that the following acts constituted violations of Section 8(a) (1) as they interfered with, restrained and coerced the New York employees in their freedom to choose to be represented by Local 325, Local 2682 or no union: (1) the interrogation of employees on June 25 and June 26; (2) the vice president's talks to employees on July 8, during which he adverted to the wage increase under the terms of the 1963–1965 contract with Local 325; (3) the company's application in July 1963 of the contract to the New York employees who had not as yet chosen to be represented by Local 325; (4) the company's grant of permission to an agent of Local 325 to solicit memberships during working hours. The complaint also alleged that the discharge of Axelrod violated Section 8(a) (3).

The Trial Examiner found that the company had violated Sections 8(a) (1) and 8(a) (3) and entered an order directing the company to cease and desist from discouraging union membership or activities and "in any other manner interfering with, restraining or coercing its employees in the exercise of their right to self-organization." There was no specific finding that the interrogation of the employees was, in purpose or effect, coercive. The Board approved the Trial Examiner's findings and conclusions but modified the order to provide that the company should cease and desist from interrogating the New York employees concerning their membership in Local 2682 in a manner contrary to Section 8(a) (1) and from applying the agreement with Local 325 to the New York employees.

In reviewing the Board's order we shall first discuss the "application" of the Local 325 agreement to the New York employees, including Welch's talks and the solicitation of memberships by Local 325. We shall then discuss the interrogations of June 25 and June 26. Finally, we shall consider the discharge of Abraham Axelrod.

I

We uphold the Board's determination that petitioner committed an unfair labor

# 203

practice by erroneously assuming that the New York plant had accreted to the previous bargaining unit and by acting as though the New York employees had already chosen Local 325 as their bargaining agent. The company does not challenge here the correctness of the Board's finding in the representation proceedings that there had been no accretion. And it is clear from our decision in NLRB v. Masters-Lake Success, Inc., 2 Cir., 1961, 287 F.2d 35, that the recognition and coverage clauses contained in the contracts with Local 325 did not justify the company's announcements that it was applying the contract to the New York plant.

In essence, the company argues that as its actions were taken in good faith it committed no unfair labor practice. There is much in this record to indicate that Welch acted in good faith, although this is disputed by the Board, but we conclude that, if the conduct complained of otherwise violated Section 8(a) (1), good faith is no defense. The cases clearly demonstrate that it is the tendency of an employer's conduct to interfere with the rights of his employees protected by Section 8(a) (1), rather than his motives, that is controlling. NLRB v. Burnup & Sims, Inc., 1964, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1; NLRB v. Erie Resistor Corp., 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308; International Ladies' Garment Workers Union, etc. v. NLRB, 1961, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762; Brooks v. NLRB, 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125; NLRB v. Masters-Lake Success, Inc., supra; United Aircraft Corp. v. NLRB, 2 Cir., 1964, 333 F.2d 819. This is especially true where, as here, the Board's order is purely remedial. International Ladies' Garment Workers Union, etc. v. NLRB, supra, 366 U.S. at 740, 81 S.Ct. 1603; cf. NLRB v. Burnup & Sims, Inc., supra.

The question before us on this phase of the case is thus reduced to whether it was a violation of Section 8(a) (1) for the company to apply the contract with Local 325 to the New York em-

ployees, announce this application, and permit a representative of Local 325 to solicit memberships on company time after the demand for recognition by Local 2682 had been rejected. The Board's conclusion that this conduct had a tendency to interfere with the fundamental right of the New York employees to choose their own representative seems to us clearly correct. See also Note, The Employer's Duty of Neutrality in the Rival Union Situation: Administrative and Judicial Application of the Midwest Piping Doctrine, 111 U.Pa.L.Rev. 930 (1963). The vice president's announcement that, as part of the contract with Local 325, the New York employees would receive a five cent an hour raise was likewise contrary to Section 8(a) (1). NLRB v. Exchange Parts Co., 1964, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435. We therefore enforce the Board's order to the extent that it forbids Welch to apply its contract with Local 325 to the New York plant, see Midwest Piping and Supply Co., 1945, 63 N.L.R.B. 1060, and to interfere with the free choice of a representative by the New York employees.

II

We hold that in the circumstances of this case, the company did not commit an unfair labor practice by interrogating the New York employees on June 25 and June 26 concerning their union membership. We find no substantial evidence in the record considered as a whole to support the Board's conclusion that the interrogation was coercive.

No purpose would be served by an extensive review of the numerous decisions dealing with interrogation. Recently we stated in Bourne v. NLRB, 2 Cir., 1964, 332 F.2d 47, 48:

"Under our decisions interrogation, not itself threatening, is not held to be an unfair labor practice unless it meets certain fairly severe standards."

See also Federation of Union Representatives v. NLRB, 2 Cir., 1964, 339 F.2d 126; NLRB v. Firedoor Corp., 2 Cir.,

1961, 291 F.2d 328, cert. denied, 368 U.S. 921, 82 S.Ct. 242, 7 L.Ed.2d 136.

Under the standards enumerated in Bourne, the interrogation here was not coercive. We note also the Trial Examiner's failure to find specifically that the questioning was coercive, the fact that the interrogation preceded any general announcement of the company's policy concerning Local 2682 or Local 325, the extremely short duration of the interrogation of each employee, and the testimony of several employees that all Rubinger did was ask them whether they had joined a union and check off their answer. Accordingly, we deny enforcement of the portion of the Board's order relating to interrogation.

### III

Earlier in this opinion we mentioned the discharge of Abraham Axelrod. The Trial Examiner and the Board concluded that Axelrod's discharge constituted a violation of Section 8(a) (3) as it was occasioned by the company's belief that he participated in activities on behalf of Local 2682. For the reasons hereinafter stated, we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456; see NLRB v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, 62 Colum.L.Rev. 1330 (1962). We therefore deny enforcement of the Board's order requiring Axelrod's reinstatement with back pay.

Axelrod began working for the company as a caster in January 1963, replacing one Santalio Negron, who was departing for Puerto Rico. Though Negron had been paid about $75 a week, Rubinger, the company's manager, agreed to pay Axelrod $90 per week with the understanding that his salary would be increased after one month to $100 if his work proved satisfactory. Despite some testimony that Axelrod's work was too slow, he received the increase at the conclusion of the month.

In March 1963, Welch's foreman, Andrew Maggi, wrote to Negron offering employment to him and his brother if they returned from Puerto Rico. Subsequently, the company hired a new caster, Schwartz, who was discharged on June 10, 1963 for reasons not challenged by the Board.

Negron returned to work as a caster on the morning of June 24, 1963. His salary was to be $75 per week, $25 less than Axelrod's. While Axelrod denied that Maggi had criticized his work on June 21 and June 24, Axelrod admitted that he had been instructed to see Rubinger at the close of work on June 24. Axelrod testified that Rubinger informed him that his work was not up to par and that Axelrod offered to participate in an exchange of molds designed to test his relative ability.

As we have stated previously, it was arranged at the Local 2682 meeting on the evening of June 24 that Prezioso, the Local's president, would telephone the claim for recognition at about 11 o'clock the next morning. When he did call, at about 11:30, one of the employees, Joseph Aulisi, whose desk was near Rubinger's, deliberately stationed himself in a position to overhear conversations occurring in Rubinger's office. The Trial Examiner stated specifically that he was crediting Aulisi's version in concluding that Axelrod was discharged at the close of work on June 25 for a forbidden anti-union purpose. Aulisi testified that after Rubinger received Prezioso's call he met with Maggi and another supervisor. According to Aulisi, "[Rubinger said,] 'I wonder who could have possibly instigated the idea of organizing a union,' and the names of Schwartz and Axelrod came up, specifically."

Although the precise context in which the names of Schwartz and Axelrod "came up" was not fully established and the possibility that others were also referred to was not ruled out, the Trial Examiner, relying solely on Aulisi's testimony, found that Axelrod's name was

"prominently mentioned" in the conversation described above. The Trial Examiner made no reference to Aulisi's testimony, moments later: "I guess they didn't know anything previous about any organization or any attempt—"

Rubinger and Maggi explained Axelrod's discharge on June 25 by testifying that Axelrod refused to go through with the exchange of molds proposed by him and scheduled for that day. Axelrod, on the other hand, testified that the test was to take place on June 26 and that he had not withdrawn from the exchange. The Trial Examiner, who of course observed the witnesses and was in the best position to evaluate their credibility, accepted Axelrod's account. We do not question this finding. See NLRB v. Walton Mfg. Co., 1962, 369 U.S. 404, 407–408, 82 S.Ct. 853.

Despite the conclusions of the Board and the suspicion aroused by the coincidence of the discharge and the notification of union activities, our review of the record in this case leads us to differ with the Board. Mindful of our delicate responsibility in this area, we believe that the record as a whole furnishes no substantial evidence for the finding that Axelrod's discharge violated Section 8(a) (3).

The most critical piece of evidence on this question, Aulisi's testimony, is, as we have indicated, equivocal. It is clear, however, that Aulisi's testimony alone is an insufficient foundation for the Trial Examiner's conclusion, based solely on that testimony, that Axelrod's name was "prominently mentioned" in the conversation among the company's supervisors. All we know is that his name "came up" or was mentioned. It is going too far, we think, to infer from this that the conversation was of such a character as to indicate a belief on the part of Rubinger that Axelrod was the instigator or even a participant in the organization of the activities of the union, or that

he had been involved in these activities in any way. A deliberate eavesdropper, such as Aulisi, would have been able to testify to matters far more damaging to the company's position than the mere mention of Axelrod's name, if the discharge really was because of Axelrod's union activities. The case, we think, is too thin. Every reasonable inference is permissible but mere suspicion must not be allowed to take the place of proof.

While we cannot disregard the Trial Examiner's resolution of the crucial question whether Axelrod refused to go through with the exchange of molds, we believe that the company has adequately explained how it happened that Axelrod was discharged on June 25, the day Local 2682 demanded recognition. The undisputed fact that Axelrod himself proposed a test of his ability on the evening preceding the call from Prezioso indicates the company's dissatisfaction with his work as of that time. And, Negron's return on June 24, at a salary far smaller than Axelrod's provides additional support for the conclusion that Axelrod's discharge the following day was not illegally motivated.

Enforcement granted in part and denied in part.

MARSHALL, Circuit Judge (dissenting):

I respectfully dissent from the portion of the majority opinion that denies enforcement to the portion of the order requiring the reinstatement of Axelrod. This admittedly close question was resolved by the Trial Examiner and the Board and there is sufficient evidence to support their decision.

On Petition for Rehearing.

PER CURIAM:
Petition denied.

MARSHALL, Circuit Judge, dissents.