**CROWN CENTRAL PETROLEUM COR-PORATION, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 28124.

United States Court of Appeals, Fifth Circuit.

July 28, 1970.

J. M. Hopper, Charles L. Berry, Houston, Tex., for petitioner; Vinson, Elkins, Searls & Connally, Houston, Tex., of counsel.

Clifford Potter, Regional Dir., N.L.R.B., 23rd Region, Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, William Wachter, Michael F. Messite, Attys., N.L.R.B., Houston, Tex., for respondent.

Before GEWIN, GODBOLD and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

Crown Central Petroleum Corporation (hereinafter, the Company)· seeks review of an order of the National Labor Relations Board finding that it vio-

lated § 8(a) (1) [1] of the National Labor Relations Act by disciplining two of its employees, for statements they made during a grievance meeting. The Board cross-petitions for enforcement. We enforce the order.

The Company operates an oil refinery in Houston, Texas. Since 1945, Local 4–227 of the Oil, Chemical & Atomic Workers International Union AFL-CIO has been the certified representative of the refinery employees. Their collective bargaining agreement establishes a workmen's committee to participate in the disposition of employee grievances. The two disciplined employees, George S. Harris and Jack R. Gilliam, had worked for the Company for over twenty years. At the time of the critical events both were members of the Workmen's Committee, and Gilliam was its chairman.

On 29 March 1968, Fred Manly, Assistant Maintenance Superintendent, asked Harris why he had not been working overtime.[2] Harris replied that he did not want to work overtime, which he understood was his option under the collective bargaining agreement. Manly and Harris then went to the office of Harry A. Taylor, Assistant Employee Relations Manager, where Harris repeated his position. At Taylor's suggestion, Harris left the office and returned with Union Committeeman William Loree. In

the meeting that followed it was the Company's position that, absent excuse, overtime was required by the contract, while the Union representatives maintained that it was optional with the employees.

According to the testimony of Harris and Loree, Taylor stated that Harris would be required to work the overtime. They also stated that Manly then "requested" Harris to work the overtime, to which Harris replied that, if he were given a choice, he would not work. According to Harris and Loree, Manly then "ordered" Harris to work the overtime, and Harris replied that he would obey the order under protest. Manly testified in general agreement with the foregoing except that he denied having "ordered" Harris to work overtime. Thereafter, Harris filed a grievance alleging that the Company had violated the collective bargaining agreement by requiring the overtime work.

On 9 May 1968, the Workmen's Committee, chaired by Gilliam and including Harris and four other employees, held a grievance meeting with Company representatives. The Harris grievance was originally brought up during the morning session, but action was deferred until the afternoon so that Manly could be present. There is a wide variety of testimony as to the precise events during the afternoon session.[3] It is clear, how-

---

1. 29 U.S.C. § 158(a) (1).

2. The refinery, at the time was engaged in a shut down of operations for major maintenance, called a "turnaround." The refinery normally operates around-the-clock, and the maintenance personnel, including Harris, were scheduled to work a ten-hour, extended day during the "turnaround" period to get the refinery back in operation as soon as possible. It appears that the other maintenance personnel had been working the extended schedule for several weeks.

3. The range of impropriety disclosed by the different versions is not so great as to affect the disposition of the case. Charles Tovey, a Company representative at the grievance meeting, made notes of the proceedings which reflect a fair average of the testimony:
Morning Session—

J. R. Gilliam—The next item will be the George Harris item. We did not get to talk to Mr. Manly in the last meeting as to whether or not he ordered George Harris to work. Messrs. Loree and Harris both say that Manly ordered Harris to work, and you and Charles say something different. We would like to have Mr. Manly in here on this matter.

G. S. Harris (to

H. A. Taylor)—You do not remember Manly ordering me to go to work?

H. A. Taylor, Jr.—No. I do not remember Manly ordering you to do anything. He asked you if you would work and stated that he needed you, and you said you would work under protest.

G. S. Harris—Harry, you sure can have a hell of a memory block.

H. A. Taylor, Jr.—Well, we will see about getting Mr. Manly to come in

ever, that under questioning from Gilliam, Manly denied having "ordered" Harris to work overtime. Harris then stated or implied that Manly's denial was a lie. Several witnesses testified that the allegation against Manly was accompanied by profanity. It also appears that Gilliam reminded Manly and the Company's representatives that they would be called upon after death and in the hereafter—in a bargaining session yet to come—to answer for their earthly prevarications. After Gilliam's remark the meeting was adjourned.

On 10 May 1968, Harris received a reprimand letter for "abusive and insubordinate language directed at supervisors" warning that any repetition would be dealt with more severely. Gilliam received a similar letter and a one day suspension for having tolerated and joined in Harris's conduct. This disciplinary action gave rise to the subject unfair labor practice charges.

The Trial Examiner held a hearing on the charges that the Company's action violated both §§ 8(a) (1) and 8(a) (3).[4] He found the facts to be substantially as we have set them out above. The Trial Examiner recognized that under a line of prior Board decisions[5] the present conduct would normally be held to be protected and beyond the reach of employer discipline. However, he observed that the balance in these cases must be made according to their particular facts, and found that there were special circumstances in the present case which required a different conclusion: (1) The Trial Examiner saw no distinction between an employee being "ordered" to do something and his being "requested" to do it, and concluded that this case was "illborn." (2) He found no justification for the remarks made by Harris and Gilliam especially in light of Manly's mild-mannered nature. (3) He found no evidence of union animus in this case or in the Company's labor history.

here after lunch. He is the man who said it and knows best what he said. Let's get some other matters out of the way in the meantime.

\* \* \* \* \*

Afternoon Session—
(Mr. Fred Manly, Maintenance Superintendent, was called to the meeting per the request of the Union to serve as a witness re the George Harris controversy.)

H. A. Taylor, Jr.—We have Mr. Manly in here now, and he can tell us what you want to know about the conversation with George Harris.

J. R. Gilliam (to Fred Manly)—Did you order George Harris to work overtime?

W. F. Manly—I asked George Harris to work.

J. R. Gilliam—Before God and these people, did you order George Harris to work?

W. F. Manly—I asked George Harris to work. I told him that he was expected to work as provided for in the contract.

G. S. Harris (leaning across the table toward Mr. Manly in anger)—Manly, I told you I would not work if you were asking me; but if you were ordering me to work, I would work under protest.

W. F. Manly—George, I told you you were requested and expected to work the overtime. I never told you you were required and I never ordered you to work.

G. S. Harris (in a loud and heated manner)—That is nothing but a damn lie.

H. A. Taylor, Jr.—This is not the place to let personalities enter into our discussions, and I will not permit such outbursts.

G. S. Harris (still in anger and accusing Mr. Manly)—Manly—we had another conversation on Sunday about this and I asked you what if I went home early then.

W. F. Manly—George, I did not talk to you Sunday or any other time about your working that overtime.

J. R. Gilliam (to W. F. Manly and shouting)—There will be a reckoning place for you and all the lies you people tell, and I am not going to put up with these \* \* \* damn lies.

H. A. Taylor, Jr.—That is all for this meeting. This meeting is adjourned.
Meeting adjourned at 2:15 P.M.

4. 29 U.S.C. §§ 158(a) (1) and (a) (3).

5. Bettcher Mfg. Corp., 76 NLRB 526; N. P. Nelson Iron Works, Inc., 80 NLRB 788; Klate Holt Co., 161 NLRB 1606; Hutting Sash & Door Co., 154 NLRB 1567; Thor Power Tool Co., 148 NLRB 1379.

On review the Board found the Trial Examiner's distinctions unpersuasive. First, it felt the merits of the underlying grievance impertinent to the question of whether the employees were unlawfully disciplined. Next, the Board concluded that the Trial Examiner's finding that the remarks were not justified, even if correct, was not controlling. It stated, "The issue is not whether the statements by Harris and Gilliam were justified by either the Trial Examiner's standards or ours, but rather whether these statements were so opprobrious as to remove them from the otherwise protected nature of a grievance meeting." Finally, the Board observed that a finding of union animus was not a necessary element of an 8(a) (1) violation. It did not feel it was necessary to determine whether the conduct was inherently discriminatory, which would have permitted a finding of an 8(a) (3) violation absent evidence of union animus; but held that the conduct violated 8(a) (1).

The Company initially contends that, inasmuch as the Board did not disturb the Trial Examiner's conclusion that the Company had no unlawful motive in disciplining Harris and Gilliam, its finding of an 8(a) (1) violation was unwarranted. The Company places its principle reliance on three cases decided by the Supreme Court in 1965. Textile Workers Union v. Darlington Manufacturing Co.; [6] N.L.R.B. v. Brown; [7] American Ship Building Co. v. N.L.R.B.[8] However, these cases, as well as later Court decisions involving unlawful employer motive,[9] dealt with alleged violations of § 8(a) (3) as well as 8(a) (1). Unlike § 8(a) (1), 8(a) (3) [10] has been construed as requiring that the prohibited conduct must be for the purpose of encouraging or discouraging membership in a labor organization.[11]

6. 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). *Darlington* concerned unfair labor practice charges under §§ 8(a) (1), (3) and (5) brought against a textile manufacturer that liquidated its business following a union victory in a representation election.

7. 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). In *Brown* the Court considered 8(a) (1) and (3) charges brought against the members of a multi-employer bargaining group who locked out their employees and hired replacements following a whipsaw strike against another member of the group.

8. 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). *American Ship Bldg.*, involved 8(a) (1) and (3) charges against an employer who locked out or laid off employees during contract negotiations to strengthen its bargaining position.

9. N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

10. Sections 8(a) (1) and (3) of the Act, 29 U.S.C. §§ 158(a) (1) and (3), provide:
(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title];
\* \* \* \* \*
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*

11. The practical role of "motive" appears to be diminishing even in the case of § 8(a) (3). *Compare* Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); N.L.R.B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); American Ship Bldg. Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), *with* N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *and* N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). *See* Christensen & Svanoe, Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality, 77 Yale L.J. 1269 (1968). In N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1798 (1967), the Court stated:
First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of

In *Darlington*, the Court stated:[12]

A violation of § 8(a) (1) alone * * * presupposes an act which is unlawful even absent a discriminatory motive. Whatever may be the limits of § 8(a) (1), some employer decisions are so peculiarly matters of management prerogative that they would never constitute violations of § 8(a) (1), whether or not they involved sound business judgment, unless they also violated § 8(a) (3).

It would thus appear that the exercise of such "management prerogatives" as going out of business[13] or engaging in a lock-out of employees[14] may not be judged initially by § 8(a) (1) and may only be held to violate that Section derivatively through a violation of 8(a) (3).[15] The discussions of employer motive cited by the Company from these cases would then relate to the requirements of § 8(a) (1) only insofar as such a violation must be derived from an 8 (a) (3) violation.[16]

important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is on the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

However, reliance by the Company on this principle to establish a need for proof of motive in an 8(a) (1) situation is misplaced. The *Great Dane* Court, while considering an alleged violation of both sections, expressly stated, "The unfair labor practice charged here is grounded primarily in § 8(a) (3) which requires specifically that the Board find a discrimination and a resulting discouragement of union membership. * * * [T]he finding of a violation normally turns on whether the discriminatory conduct was motivated by an antiunion purpose." 388 U.S. at 32, 33, 87 S.Ct. at 1796, 1797.

12. 380 U.S. at 269, 85 S.Ct. at 999.

13. See Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).

14. See N.L.R.B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); American Ship Bldg. Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

15. The relationship of Section 8(a) (3) to the broader mandate of Section 8(a) (1) is made dependent [by *Darlington*, *Brown* and *American Ship Bldg.*] upon the simplistic and highly subjective standard of those management and union actions which are "peculiarly" essential to the running of the enterprise. If the Board—or eventually the Court—senses that a particular action involves the life of the enterprise deeply enough, motivation—together with the remaining requirements of Section 8(a) (3)—becomes a determinative factor as to the legality of that act. No guides are suggested for the approach taken to this enormously complex problem. * * * Christensen & Svanoe, *supra* note 11, at 1307.

16. From the Court's discussion of Section 8(a) (1) in *Brown* and *American Ship Bldg.*, it does not appear that it considered an independent violation of 8(a) (1) to be possible in either case. In *Brown* the Court stated:

Continued operations with the use of temporary replacements may result in the failure of the whipsaw strike, but this does not mean that the employer's conduct is demonstrably so destructive of employee rights and so devoid of significant service to any legitimate business end that it cannot be tolerated consistently with the Act. 380 U.S. at 286, 85 S.Ct. at 985.

In *American Ship Bldg.*, the Court stated:

[W]e cannot see that the employer's use of a lockout solely in support of a legitimate bargaining position is in any way inconsistent with either the right to bargain collectively or with the right to strike. 380 U.S. at 310, 85 S.Ct. at 963.

These decisions have been attributed to the Court's view that the Board, in determining available employer weapons, defeated the *free* collective bargaining envisioned by the Act. See Oberer, The

In the present case the Board did not sustain the charge under § 8(a)(3); it stated:

> Affirmative evidence of union animus might be necessary to support a violation of Section 8(a)(3) but it is not necessary to support a violation of Section 8(a)(1). Accordingly, while Respondent's disciplining of Harris and Gilliam for engaging in the collective-bargaining process itself may have been inherently discriminatory, we find it unnecessary to resolve that issue, for we find that in any event such disciplining constituted interference, restraint, and coercion with respect to Section 7 rights, and thus violated Section 8(a)(1).

In our opinion, the disciplining of employees for insubordination, while certainly the right of management, is not such an inherent management prerogative as to be immune from challenge as a primary violation of § 8(a)(1). When thus considered, the motive behind an employer's conduct is not an element of the unfair labor practice charged.[17] In Welch Scientific Co. v. N.L.R.B., the court stated:[18]

> In essence, the company argues that as its actions were taken in good faith it committed no unfair labor practice. There is much in this record to indicate that [the company] acted in good faith * * *, but we conclude that, if the conduct complained of otherwise violated Section 8(a)(1), good faith is no defense.

The cases clearly demonstrate that it is the tendency of an employer's conduct to interfere with the rights of his employees protected by Section 8(a)(1), rather than his motives, that is controlling.

Under the facts and in the circumstances disclosed by the record before us the absence of a finding of unlawful motive is not fatal to the Board's conclusion that the Company violated 8(a)(1).

The question remaining is whether the Board properly concluded that the conduct of Harris and Gilliam was protected by the Act so as to make the imposition of disciplinary sanction violative of Section 8(a)(1). Initially, the filing and prosecution of employee grievances is a fundamental, day-to-day part of collective bargaining and is protected by Section 7.[19] In a general sense, both employees were engaged in protected activity at the time the objectionable statements were made, but this does not dispose of the case. An employee may not act with impunity even though he is engaged in protected activity. His rights, derived from Section 7, must be balanced against the employer's right to maintain order in his business by punishing acts of insubordination.

In Boaz Spinning Co. v. N.L.R.B.,[20] this court refused to enforce an order of the board which found that the company violated Section 8(a)(1) in discharging an employee for insubordinate conduct. There, the plant manager made a lawful persuasion speech to his assembled em-

---

Scienter Factor in Sections 8(a)(1) and (3) of the Labor Act, 52 Cornell L.Q. 491 (1967). In the present case, it is the Company's action that is destructive of the bargaining process.

17. N.L.R.B. v. Burnup & Sims, Inc., 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964); International Ladies' Garment Workers' Union v. N.L.R.B., 366 U.S. 731, 739, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); NLRB v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 866 (5th Cir. 1966); Welch Scientific Co. v. N.L.R.B., 340 F.2d 199, 203 (2d Cir. 1965).

18. 340 F.2d 199, 203 (2d Cir. 1965).

19. N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); N.L.R.B. v. Bowman Transportation, Inc., 314 F.2d 497 (5th Cir. 1963); Hugh H. Wilson Corp. v. N.L. R.B., 414 F.2d 1345 (3d Cir. 1969).
Section 7, 29 U.S.C. § 157, provides in part:
> Employees shall have the right to self-organization, to form, join, or assist labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. * * *

20. 395 F.2d 512 (5th Cir. 1968).

ployees prior to a Board election. An employee tried, at several points, to interrupt the speech with pro-union statements. After being twice advised that the meeting was closed and that union advocates would no be allowed the floor, the employee called the plant manager a "Castro," stating that he ran his plant after the fashion of totalitarian dictators. In considering the finding that he was wrongfully discharged, this court stated:

> Undoubtedly "flagrant conduct of an employee, even though occurring in the course of section 7 activity, may justify disciplinary action by the employer. On the other hand, not every impropriety committed during such activity places the employee beyond the protective shield of the act. The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect." [21]

"Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed." [22] Reviewing the circumstances of the present case, we are convinced that the balance struck by the Board is authorized. [23] On the employer's side of the scale lies the injury done the Company by intemperate and insubordinate remarks directed toward a supervisor during a grievance meeting and in the presence of four other employees. [24] This deprives the present situation of any analogy to that found in *Boaz,* where all the plant employees were present and the employer had legitimately determined that competing views could not be aired. [25]

The Company emphasizes the lack of justification for the employees' statements and the coarse nature of their language. We agree with the Board that whether the remarks were by some stand-

21. 395 F.2d at 514, quoting N.L.R.B. v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir. 1965).

Also see Hugh H. Wilson Corp. v. N.L. R.B., 414 F.2d 1345 (3d Cir. 1969); Montgomery Ward & Co. v. N.L.R.B., 374 F.2d 606, 608 (10th Cir. 1967); Socony Mobil Oil Co. v. N.L.R.B., 357 F.2d 662, 663 (2d Cir. 1966); N.L.R.B. v. Efco Mfg. Co., 227 F.2d 675 (1st Cir.), cert. denied, 350 U.S. 1007, 76 S.Ct. 651, 100 L.Ed. 869 (1955). *See* Owens-Corning Fiberglas Corp. v. N.L.R.B., 407 F.2d 1357 (4th Cir. 1969); Walls Mfg. Co. v. N.L.R.B., 116 U.S.App.D.C. 140, 321 F.2d 753 cert. denied, 375 U.S. 923, 84 S.Ct. 265, 11 L.Ed.2d 166 (1963).

22. N.L.R.B. v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir. 1965).

23. The Board, not the Trial Examiner bears the ultimate responsibility for striking the balance. Falcon Plastics Div. of B–D Lab., Inc. v. N.L.R.B., 397 F.2d 965 (9th Cir. 1968). Inasmuch as the Board did not reverse the Trial Examiner on a question of fact or an issue of credibility, but only as to his legal conclusions; we attach little significance to the difference of opinion. The Board concluded, as it was authorized to do, that the facts found

by the Trial Examiner did not support the legal conclusion he reached.

24. There is no evidentiary basis for the Company's allegation that the events of the grievance meeting were "broadcast" throughout the plant. While it does appear that some of the employees knew of the incident, there is also an indication that a part of this group had been informed by their supervisors.

25. *Boaz* was based on a delicate convergence of circumstances. N.L.R.B. v. Leece-Neville Co., 396 F.2d 773 (5th Cir. 1968). This court in *Boaz* stated:
If, by hypothesis, the employee had been given the floor for the purpose of making a pro-union speech but had used the same language, it might be difficult to uphold his discharge, for the cases discussed herein show that some allowance must be made for intemperate language used during a heated union campaign. It might also be difficult to sustain a discharge were the hypothetical situation reversed so that the employee had interrupted his employer to make an unauthorized speech but had not resorted to intemperate language. In the instant case, however, both factors are present. * * * 395 F.2d at 516.

ard "justified" is not controlling. Here the remarks were pertinent to a discussion of the grievance under consideration at the meeting. "[A]s long as the activities engaged in are lawful and the character of the conduct is not *indefensible* in the context of the grievance involved, the employees are protected under § 7 of the act." [26] Neither do we think the language used by Harris and Gilliam was so opprobrious as to carry them "beyond the pale" of the Act's protection. It has been repeatedly observed that passions run high in labor disputes and that epithets and accusations are commonplace.[27] Grievance meetings arising out of disputes between employer and employee are not calculated to create an aura of total peace and tranquility where compliments are lavishly exchanged. Adding our disclaimer to that of the Board, we do not condone the conduct of Harris and Gilliam in the meeting, but we do not feel that the interests of collective bargaining will be served by the external imposition of a rigid standard of proper and civilized behavior.

Of central importance to our view of the case, is the nature of the protected activity involved. Harris and Gilliam were participating in a grievance meeting, which by its very nature requires a free and frank exchange of views, and where bruised sensibilities may be the price exacted for industrial peace. As the Board noted, a grievance proceeding is not an audience, conditionally granted by a master to his servants, but a meeting of equals—advocates of their respective positions. Manly was not assailed with abuse on the floor of the plant where he stood as a symbol of the Company's authority; the characterization of the untruth came while he was appearing as a Company advocate during a closed meeting with Union representatives.

Quoting its decision in Bettcher Manufacturing,[28] the Board stated:

A frank, and not always complimentary, exchange of views must be expected and permitted the negotiators if collective bargaining is to be natural rather than stilted. The negotiators must be free not only to put forth demands and counterdemands, but also to debate and challenge the statements of one another without censorship, *even if, in the course of debate, the veracity of one of the participants occasionally is brought into question.* If an employer were free to discharge an individual employee because he resented a statement made by the employee during a bargaining conference, either one of two undesirable results would follow: collective bargaining would cease to be between equals (an employee having no parallel method of retaliation), or employees would hesitate ever to participate personally in bargaining negotiations, leaving such matters entirely to their representatives.

We seek neither to rank improprieties or epithets, nor to unnecessarily generalize for a class of cases peculiarly tied to their facts. However, within the confines of a grievance meeting, it would require severe conduct indeed to convince us that the interests of fair give and take between equal parties to bargaining could be justifiably submerged.

For the reasons set out above, the order of the Board is enforced.

---

26. Hugh H. Wilson Corp. v. N.L.R.B., 414 F.2d 1345, 1355–1356 (3d Cir. 1969).

27. *Id.* at 1356.
   In Linn v. United Plant Guard Workers, 383 U.S. 53, 60–61, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966), the Court observed:
   [T]he Board has concluded that epithets such as "scat," "unfair," and "liar" are commonplace in these [organization] struggles and not so indefensible as to remove them from the protection of § 7, even though the statements are erroneous and defame one of the parties to the dispute."

28. 76 NLRB 526 (1948).