**SPERRY SYSTEMS MANAGEMENT DIVISION, SPERRY RAND CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
and
**Local 445, International Union of Electrical, Radio and Machine Workers, AFL–CIO, Intervenor.**

No. 296, Docket 73–1621.

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1974.

Decided Feb. 15, 1974.

---

Herbert Prashker, New York City (Poletti Freidin Prashker Feldman & Gartner, Eric Rosenfeld, and Edward R. Cohen, New York City, on the brief), for petitioner.

Jonathan G. Axelrod, N. L. R. B., Washington, D. C. (Paul J. Spielberg, Atty., Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on the brief), for respondent.

Everett E. Lewis, New York City (Vladeck Elias Vladeck & Lewis, and Sylvan H. Élias, New York City on the brief), for intervenor.

Before DANAHER,* LUMBARD and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

Pursuant to § 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f), the Sperry Systems Management Division of the Sperry Rand Corporation (the Company) petitions this court to review and set aside an order of a divided National Labor Relations Board which on March 5, 1973 dismissed a complaint against Local 445 of the International Union of Electrical, Radio and Machine Workers, AFL–CIO (the Union), 202 N.L.R.B. No. 18. The complaint charged, and the Company here argues, that the actions of Local 445 constituted the unfair labor practice of

* Senior Circuit Judge of the District of Columbia Circuit, sitting by designation.

refusing to bargain collectively in violation of § 8(b)(3) of the Act, 29 U.S.C. § 158(b)(3). We find that on this record the Board erred in dismissing the complaint, and, therefore, we grant the petition, set aside the Board's order, and remand for further proceedings.

## I.

On June 6, 1962, the Board certified Local 445 as the bargaining representative for certain of the Company's technical employees at its plants in "metropolitan New York City, including Nassau and Suffolk Counties [the remainder of Long Island], on temporary assignments wherever located from said plants, and on temporary or permanent assignments from said plants to customer or vendor installations, wherever located." At all times relevant to this proceeding, Article 1 of the collective bargaining agreement between the Company and the Union provided, "This Agreement shall apply to all plants now operated by the Employer, its successors and assigns, wherever situated." This discrepancy between the certification and the agreement concerning the proper collective bargaining unit would lead to complex litigation of which the instant case is but a part.

In the spring of 1970, the Company commenced operations in a new facility in Vallejo, California, in which it employed, among others, three draftsmen who performed work similar to that performed by Local 445's members on Long Island. No draftsman was transferred to the California facility from the New York City area.[1] In November 1970 the Union, having learned that the three employees at Vallejo had been given different titles and lesser pay than workers doing comparable work in New York, filed a grievance with the Company which demanded that the Company apply the New York City agreement to the Vallejo employees.

The Company denied the grievance and the matter went to arbitration pursuant to the contractual procedures. The issue presented at a hearing before Arbitrator Benjamin C. Roberts was "[w]hether the technical personnel performing drafting work at Vallejo, California, are under the coverage of the collective bargaining agreement with Local 445." On April 19, 1971, Arbitrator Roberts issued a 22-page opinion in which he concluded that the parties in Article 1 did mean to apply the agreement to all of the Company's plants, wherever located. He, however, said that he could not apply the representation provisions of the agreement to the Vallejo employees without violating their right under the Act not to organize. Consequently, he required compliance only with the wages and other conditions of employment, which provisions he felt could be legally enforced.

His award read:

> As a matter of law, the technical personnel performing drafting work at the Company's plant at Vallejo, California, are not under the coverage of the collective bargaining agreement with Local 445. However, they shall be governed by the wages and other terms of employment contained in the Local 445 Agreement (excluding the Union Shop and other representation clauses) and retroactive to June 5, 1970.

On May 3, 1971, the Union's president, Henry Zylla, wrote the Company, saying that the Union expected the award to be applied to all the Company's plants. In following weeks Zylla met with Company officials several times in an effort to enforce the award. The Company was told that the Union did not seek to represent the Vallejo workers, but rather was trying to protect the job security of the Long Island workers, which might be threatened if the Company continued to pay lower wages in

---

[1]. The Company did transfer several members of the Engineers Union, which had a contract provision similar to Article 1, from its Great Neck, Long Island facility to Vallejo. As a result, the Company recognized that union as the representative of both the assigned and newly hired engineers.

California. Zylla also said that the Union interpreted the arbitrator's award as only setting a minimum for the California employees—the Company could pay them more if it desired.

On July 26 the Union filed a second grievance with the Company which alleged that the Company had failed to comply with Article 1 of the Agreement as interpreted by the arbitrator and which demanded that the Company comply with the award, recall the two Vallejo draftsmen who had been laid off in March by procedures allegedly improper under the contract, and make the two whole. One response of the Company was to file on August 2 the unfair labor practice charges that led to the instant case. The other was to deny the grievance after a meeting its labor relations supervisor had on August 11 with Zylla and another union official. Zylla at this meeting listed the Union's demands relating to compliance with the award which dealt with wages; severance, vacation and sick pay; pension contributions; tuition refunds; overtime payments; the participation in a merit kitty; the recall of the two draftsmen; reimbursement of their medical expenses; and the reclassification of the drafting personnel wrongly classified. Following the Company's rejection on August 25, the Union proposed arbitration and an arbitrator was agreed upon, but the parties subsequently postponed the arbitration indefinitely.

Simultaneously with its efforts to enforce the arbitration award, Local 445 also attempted to become the bargaining representative for the Vallejo employees. On May 10 it filed a representation petition with the Board's Region 20 in San Francisco. On July 8 the Regional Director ordered an election in a unit consisting of the draftsmen and two clerical employees, which the Union lost on August 5 by a vote of 2 to 0, with one vote being challenged.[2] The Union challenged this result and filed unfair labor practice charges against the Company alleging, inter alia, that the two draftsmen had been laid off because of their union activity. Following an investigation, the Regional Director dismissed the charges on September 14. He found that the layoffs had been caused by a lack of work and that when work subsequently became available the Company for business reasons had subcontracted it. On December 3 this dismissal was sustained by the General Counsel, and on December 16 the Regional Director overruled the Union's objections and certified the election results.

Meanwhile, Sperry on July 20 filed a petition in the New York County Supreme Court to modify the arbitrator's award insofar as it applied the New York City agreement to Vallejo, on the grounds that the award went beyond the only issue submitted to the arbitrator which was whether the agreement applied in toto to the California employees and that the Company's compliance with the award would violate the rights of the California employees. On November 2, Justice Amsterdam filed a decision granting the Company's petition on both grounds, 80 L.R.R.M. 2061. The Union appealed, but on its motion the Appellate Division postponed hearing the appeal until after the Board's decision in the instant case. Following that decision, the Appellate Division affirmed without opinion on June 19, 1973, 42 A.D.2d 691, 345 N.Y.S.2d 972, and on October 17, the Court of Appeals denied leave to appeal, 33 N.Y.2d 517.

## II.

The complaint before the Board charged that the Union's efforts to enforce the arbitration award after May 1, 1971 constituted the unfair labor prac-

2. As mentioned earlier, two of the three draftsmen had been laid off. They were allowed to vote, subject to later challenge. Only one of them did. Since the two employees who did vote voted against the Union, the challenged vote was not counted.

tice of refusing to bargain collectively. After a hearing held on March 6, 1972, Trial Examiner[3] Paul Bisgyer handed down a decision on July 12, 1972 finding that the Union's activities aimed at enforcing the award were motivated by a desire to protect the job security of the Long Island employees and not by a desire to represent the Vallejo employees. He found nothing in the arbitrator's award or in the Union's actions that was repugnant to the National Labor Relations Act. He, therefore, recommended dismissal of the complaint.

■ Three members of the Board, Chairman Miller and Members Fanning and Jenkins, agreed with the trial examiner that the complaint should be dismissed. Although their opinion is not entirely clear, they apparently found that the object of Local 445's efforts in enforcing the award was preservation of the work of the New York City unit and not recognition as bargaining agent in California. They assumed that the arbitrator was correct in finding that the parties had voluntarily agreed to apply the terms of the New York agreement as minimum terms for employees doing similar work outside of the unit, which they said did not contravene the Act. Finally, they noted that none of Local 445's actions in securing enforcement of the award was "necessarily disruptive" of the bargaining relationship in New York.[4] Stated another way, the Board held that, if the Union's goal was not representation, the minimum wages and conditions of employment of the Vallejo employees were permissive subjects of bargaining in the New York City unit and that the Union's efforts at enforcing the award did not constitute bargaining to impasse. Such a result is

necessary before there can be a failure to bargain in such circumstances. See generally NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S. Ct. 718, 2 L.Ed.2d 823 (1958).

Members Kennedy and Penello in dissent argued that the evidence established that the Union's efforts in securing the Company's compliance with the award were representational. They also argued that regardless of motive the Company could not agree with the representative of the New York City employees about the terms of employment of its California employees without violating the § 7 rights of the California employees, 29 U.S.C. § 157. For reasons that appear below, we agree with the Board's dissenters.

## III.

■ In Douds v. International Longshoremen's Association, 241 F.2d 278 (2d Cir. 1957), we upheld the district court's granting of a preliminary injunction sought by the Board against a union. In so doing, we held that a union fails to bargain in good faith when it demands over the company's objections a change in the bargaining unit so that it can represent other employees after the Board determines that the unit should remain unchanged. The Seventh Circuit in Smith Steel Workers v. A. O. Smith Corp., 420 F.2d 1 (7th Cir. 1969), enforced a Board order that held that a union failed to bargain when it continued to insist that it represented certain workers and sought arbitration of the issue after a Board decision that the workers were part of a unit represented by another union. The court held that following the Board's clarification order, the union had no right to employ griev-

---

3. The title has since been changed to administrative law judge.

4. The Company interprets the Board's holding as saying that irrespective of whether or not the Union was seeking to represent the Vallejo employees, there was no unfair labor practice since there was no disruption in the New York relationship between Company and Un-

ion. If this is what the Board held, it is clearly wrong. Demands by a union to represent employees outside the certified union are unfair labor practices even if no disruption occurs. See Smith Steel Workers v. A. O. Smith Corp., 420 F.2d 1 (7th Cir. 1969); Douds v. International Longshoremen's Association, 241 F.2d 278 (2d Cir. 1957).

ance procedures to overturn it. The thrust of both decisions is that after a valid Board decision of the appropriate bargaining unit under § 9 of the Act, 29 U.S.C. § 159, a union's attempt to represent workers outside that unit constitutes failure to bargain collectively. See also Boire v. International Brotherhood of Teamsters, 479 F.2d 778 (5th Cir. 1973); Local 7-210, OCAW v. Union Tank Car Co., 475 F.2d 194 (7th Cir.), cert. denied 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973).

We believe that *Douds* and *Smith* control the result here. First, it is clear that at all relevant times, all parties agreed that the Vallejo employees were a separate bargaining unit from the New York City unit. Several of the events at issue occurred after the Board validly ordered an election at a unit consisting only of the Vallejo draftsmen and clerical employees. And even before this order the union did not claim that the Vallejo employees were an accretion to the New York City unit, which the Board certified in 1962. See generally Melbet Jewelry Co., 180 N.L.R.B. 107 (1969); Supermarkets General Corp., 170 N.L.R. B. 446 (1968), enforced sub nom. Local 919, Retail Clerks v. N.L.R.B, 135 U.S. App.D.C. 103, 416 F.2d 1118 (1969).

Second, the Board's finding that the Union's efforts were motivated by a desire to protect the job security of the Long Island employees and not by a desire to represent the Vallejo employees was not supported by substantial evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951). The Union's efforts to secure the reinstatement of the two draftsmen who had been laid off in March 1971 is utterly inconsistent with the Union's alleged purpose of protecting the job security of the New York City unit employees.[5] Moreover, it is difficult to see how the Union at the times relevant to the charges here could have believed that the Vallejo unit affected the job security of the New York City unit. At the hearing before the trial examiner, Zylla made the unsubstantiated claim that the Company in the fall of 1970 was planning to expand the Vallejo facility, but by March 1971 it was clear that the Company was contracting the unit. Only one draftsman was employed there after that date. It strains credulity to believe that the Union honestly believed that its New York City unit consisting of a large number of employees was significantly threatened by a single draftsman working for lower wages almost three thousand miles away. The only reasonable conclusion is that the Union was seeking to represent the Vallejo employees through both the representation election in California and the grievance procedures in New York.

Thus, the Union's activities in enforcing the award must be characterized as a *sub rosa* attempt to gain the *de facto* recognition as bargaining agent of the Vallejo employees which it might not and did not gain in the election. The rationale of *Douds* and *Smith* prohibits

---

5. The Board's majority described the Union's efforts at arbitrating the validity of the layoffs as merely an attempt to discuss whether its objections to them were representational or were related to the economic benefits given the California employees. There is, however, no evidence that the Union was seeking reinstatement of the two draftsmen only if their economic benefits affected the New York City unit. The Board's attempt in its brief to label the reinstatement demand as being merely "inadvertent" is similarly unpersuasive. Most of the second sentence of the two-sentence grievance filed on July 26 dealt with this issue.

The trial examiner argued in his opinion that the reinstatement demand was consistent with the Union's efforts to win the representational election in California, and was, therefore, proper. Certainly the demand was consistent with the Union's desire to win the election, but the issue here is what was the Union's dominant motive in employing the grievance procedure of the New York City agreement. The reinstatement demand shows that it was to represent the employees in California.

unions from engaging in covert attempts to subvert the Board's orders regarding the proper bargaining unit as well as the overt attempts at issue there.

## IV.

We also hold that, regardless of the Union's motive in seeking enforcement of the arbitration award, it committed an unfair labor practice because the subject of the wages and working conditions of the Vallejo employees was not a permissible subject of bargaining in the New York City unit. Section 7 of the Act guarantees employees the right to organize and bargain collectively and the right to refrain from such activities. Generally, an employer commits the unfair labor practices of interfering with employees' § 7 rights and supporting a union in violation of § 8(a)(1) and (a)(2) when it imposes on employees of one unit the contract and bargaining agent of another unit. See, *e. g.*, Sheraton-Kauai Corp. v. NLRB, 429 F.2d 1352 (9th Cir. 1970); Welch Scientific Co. v. NLRB, 340 F.2d 199 (2d Cir. 1965).

The Board's majority held that no provision of the Act was violated when parties voluntarily agree that the terms of their collective bargaining agreement will be the minimum terms of employment for the employer's employees not in the bargaining unit if the purpose of the agreement is to protect the job security and wage structure of the employees within the unit. This ruling, however, raises the possibility of serious infringements on the rights of those employees outside the unit, especially where, as is the case here, there is no evidence that the job security of workers in the unit may be affected. The interests of employees within and without the unit might conflict at several points. For example, the workers outside the unit might wish to accept lower wages in return for more jobs. Requiring them to accept as a minimum the higher wages of other employees' collective bargaining agreement may thwart their desires. This difficulty is compounded when, as happened here, the union insists that minimum terms for the workers outside its unit match the terms of its agreement down to such minutiae as tuition refunds. The workers outside the unit, either individually or collectively, might have differing economic priorities, such as preferring take-home pay to fringe benefits, even though the total cost to the employer of their demands be the same.

In support of its holding, the Board cites Local 24, Teamsters v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959). In that case the Court held that a state could not hold a portion of a multi-employer collective bargaining agreement illegal under its antitrust law since the matter was a mandatory subject of bargaining under the National Labor Relations Act. The agreement between the carriers and their truck drivers required that when trucks rented by the carriers were driven by their owners the owner-drivers must be paid the wages provided in the carriers' agreement with the drivers and a certain minimum rental for the trucks. The record indicated that the minimum rental was the estimated cost to the truck owner of the trip and was negotiated in response to the practice of the carriers negotiating rentals that were below the owner-drivers' costs. The owner-drivers were in effect accepting lower wages than the agreement called for. The Court in *Oliver* held that the minimum rental paid to the owner-drivers was a mandatory subject of bargaining between the carriers and their drivers since it represented "a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining agreement." 358 U.S. at 294, 79 S.Ct. at 304.

■■ *Oliver's* holding that the terms of employment of those outside the unit can be mandatory subjects of bargaining has been limited to situations in which

those terms "vitally affect" the unit employees. Chemical Workers, Local 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 179, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). A balancing of the interests of the employees inside and outside the bargaining unit requires, we believe, that bargaining over the terms of employment of workers outside the unit be likewise limited. Even though in an interdependent economy the wages of one group of workers potentially might affect the wages of all other workers, an employer generally cannot bargain with a union over the wages that the union will negotiate with other employers, see United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626, (1965),[6] nor can a union bargain with an employer over the wages that the company will negotiate with its other employees absent evidence that the other employees' wages vitally affect the terms of employment of the workers the union represents.[7] As noted above, there is no evidence that the terms of employment at the Vallejo unit affected the New York City unit. Therefore, the Company could not have complied with the arbitrators' award without infringing upon the rights of the Vallejo employees in violation of § 8(a)(1) and (a)(2) of the Act, and the Union's attempt to require it do so constitutes a failure to bargain collectively in violation of § 8(b)(3) of the Act.[8]

Accordingly, the Company's petition is granted, the Board's order is vacated, and the case is remanded for further proceedings consistent with this opinion.

---

6. The Board has held that an employer may insist upon a "most favored nation" clause in an agreement. Dolly Madison Industries, Inc., 182 N.L.R.B. 1037 (1970).

7. This is not a situation in which a collective bargaining agreement requires that certain work be done by workers in the unit even though workers outside the unit may be affected. See National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Local 24, Teamsters v. Oliver, 362 U.S. 605, 80 S.Ct. 923, 4 L.Ed.2d 987 (1960) (Oliver

II). Cf. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Here the Union is attempting to set the minimum terms of employment for workers outside the unit.

8. It is no defense that the arbitrator determined that the New York City agreement applied to the Vallejo unit, because his award was repugnant to the Act. See Pix Manufacturing Co., 181 N.L.R.B. 88 (1970). See generally Ryder Technical Institute, 199 N.L.R.B. No. 85 (1972); Collyer Insulated Wire, 192 N.L.R.B. No. 150 (1971).