Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta, a la cual se une el Juez Presidente Señor Hernández Denton.
Disiento enérgicamente de la conclusión a la que llega la mayoría de este Tribunal respecto al ejercicio de jurisdicción de nuestros tribunales en este caso. Preocupa, sobre todo, el que se deje sin jurisdicción a nuestra Judicatura, de forma casi automática, con la mera alegación de que la actuación de un obrero constituyó una “actividad concertada” bajo la Ley Federal de Relaciones Obrero Patronales, mejor conocida como Ley Taft-Hartley de 1947.
Es cierto que la Junta Nacional de Relaciones del Trabajo (NLRB, por sus siglas en inglés) tiene jurisdicción ex-clusiva sobre la administración de la Ley Taft-Hartley y sus procedimientos. En lo pertinente, la NLRB penaliza las prácticas ilícitas, incluso el despido como represalia por la *866 realización de actividades concertadas por los trabajadores para defender sus derechos. No obstante, no podemos concluir, como lo hace la opinión mayoritaria, que la actuación del señor González Sotomayor constituía una “actividad concertada” sobre la base, exclusivamente, de las expresiones que el propio señor González Sotomayor hizo en su querella contra Mayagüez Resort & Casino. Esta interpretación es contraria a la definición legal y jurídica del término en el campo de las relaciones obrero-patronales.
Según la opinión mayoritaria, en este caso se configuró una “actividad concertada” porque el señor González Soto-mayor alegó que: (1) solicitó una reunión con su patrono para plantear asuntos relacionados con su trabajo y sus derechos como empleado; (2) fue despedido por su uso válido de su derecho constitucional de participar en actividades concertadas, y (3) su patrono Mayagüez Resort & Casino entendía que estaba tratando de organizar a los empleados de su departamento y por eso lo despidió. A esta conclusión se llega a pesar de que el propio hotel expuso en su alegación responsiva que el despido del señor González Sotomayor fue por cuestiones disciplinarias, y sin que del expediente surja que Mayagüez Resort & Casino conocía o debía conocer las alegadas actividades concertadas del señor González Sotomayor. También, esta conclusión se construye sin ni siquiera discutir qué es una actividad concertada y verificar si los requisitos de esta figura jurídica están presentes en los hechos particulares de este caso. Todo esto es contrario a la norma que establece que el nombre no hace a la cosa.
En resumen, la opinión mayoritaria asume la existencia de una práctica ilícita y la existencia de un proceso de organización. De esa forma, Concluye de esa forma que había una “actividad concertada”, planteando acríticamente que el campo está ocupado por la Ley Federal de Relaciones Obrero Patronales, Ley Taft-Hartley de 1947. Esto a pesar de que en realidad la iniciativa del señor González Sotomayor no pasó de ser un intento fallido de completar un proceso administrativo destinado a dilucidar con *867 diciones de empleo individuales; un proceso normal de libertad de expresión, derecho que está protegido por nuestra Constitución.
Si bien las actividades concertadas pueden darse fuera del ámbito de la negociación colectiva, toda actividad concertada incluye una intención de representar a los trabajadores ante el patrono o proteger conquistas expresadas en quejas del grupo sobre condiciones de trabajo o para negociar colectivamente. Lo medular no es el contexto, sino que efectivamente haya una representación autorizada de parte de todos los trabajadores que dicen ser representados.
La opinión mayoritaria omite hechos medulares de este caso. Por esto, me veo obligada a exponer los hechos pertinentes a la controversia que surgen de los documentos que se incluyen en el legajo.
I
El señor González Sotomayor trabajó para la corporación Mayagüez Resort & Casino hasta el 15 de marzo de 2006, fecha cuando fue despedido del puesto de mozo que ocupaba en el departamento de banquetes. Previo a su despido, el 10 de marzo de 2006, el señor González Sotomayor y el Sr. Raymond Betances López solicitaron en el Departamento de Recursos Humanos una reunión para dialogar sobre los asuntos relacionados con su trabajo y sus derechos como empleados. En esa misma fecha, la Sra. Leslie A. Santoni, gerente del Departamento de Recursos Humanos, les confirmó por escrito que la reunión se iba a celebrar el 15 de marzo de 2006 y que ahí estarían el personal gerencial y los empleados del área de banquetes.
En efecto, la reunión solicitada se efectuó en la fecha pautada. Sin embargo, el señor González Sotomayor no pudo comparecer porque ese mismo día fue despedido de su empleo. A esta reunión asistieron gerenciales y empleados no exentos, para un total de 11 personas, entre las cuales se encontraban Raymond Betances López, el otro empleado que junto al señor González Sotomayor solicitó la reunión; *868 Iván Seda; Alfredo Rodríguez; Rosa Estrella; Carmen Aponte; Edwin Rivera; Mike Kranz; Carlos Irizarry; Louis B. Muñoz, gerente; José Graniela, supervisor del señor González Sotomayor, y Leslie A. Santoni.
En esta reunión, sobre la cual el personal del Departamento de Recursos Humanos del hotel escribió una minuta, se plantearon sólo dos asuntos: (1) el señor Betances López cuestionó la distribución equitativa del trabajo, a pesar de que él tenía más años de servicios en el hotel que los empleados nuevos; (2) la señora Estrella, además de unirse a la inquietud del empleado Betances López, añadió que se sentía incómoda por el incidente de un robo de una cartera, donde la señora afectada alegadamente la había inculpado a ella. Estos planteamientos o quejas se hicieron de forma individual y con el único interés de velar y proteger el interés particular de los exponentes.(1)
Respecto al primer punto, el señor Muñoz expresó que inicialmente se consideraba el “seniority” del empleado para la distribución del trabajo, pero que dio instrucciones de cambiar ese procedimiento a una repartición equitativa del trabajo para impedir el tiempo extra y evitar la pérdida de meseros por falta de trabajo. En cuanto al segundo asunto, le clarificó a la señora Estrella que si nadie la había acusado no tenía por qué preocuparse. Tanto el señor Betances López como la señora Estrella mostraron entendimiento sobre las justificaciones que expresó la gerencia en cuanto a sus inquietudes. Los demás empleados comentaron que se sentían a gusto en el hotel y que venían a trabajar.(2)
El 13 de junio de 2006, el señor González Sotomayor presentó una querella contra el Mayagüez Resort & Casino bajo el procedimiento sumario que dispone la Ley Núm. 2 de 17 de octubre de 1961 (32 L.RR.A. see. 3118 et seq.). Su reclamo estuvo fundamentado en la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185(a), *869 conocida como Ley de Despido Injustificado, la Ley Núm. 115 de 20 de diciembre de 1991 (29 L.P.R.A. see. 194 et seq.), conocida como Ley de Represalias, y en el Artículo II, Secciones 16-18, de nuestra Constitución, L.P.R.A., Tomo 1. Entre las alegaciones pertinentes del señor González Sotomayor se encuentran que el Mayagüez Resort & Casino lo despidió por hacer “uso válido de su derecho constitucional de participar en actividades concertadas y reclamar derechos que como empleado le corresponden” (énfasis nuestro),(3) porque entendía que él estaba “tratando de organizar a los empleados de su departamento”(4) y porque “solicitó una reunión con la gerencia para discutir sus condiciones de ¿raóq/o”.(Énfasis nuestro.)(5) Por último, indicó que “no era la primera vez que ... reclamaba derechos que como empleado le correspondían” y que por su despido injustificado el hotel tenía que indemnizarle la cantidad de $13,510. (Énfasis nuestro.)(6)
Por su parte, el patrono Mayagüez Resort & Casino contestó la querella el 22 de junio de 2006, planteando, en esencia, que el señor González Sotomayor había sido despedido justificadamente conforme a la normativa esbozada en la Ley Núm. 80, según enmendada, supra, y que éste no tenía una causa de acción bajo la Ley Núm. 115, supra. En concreto, el hotel alegó que el señor González Sotomayor había sido despedido “por un incidente acontecido el 11 de *870 marzo de 2006 y en virtud de su historial disciplinario anterior”.(7)
Respecto al incidente del 11 de marzo de 2006, Mayagüez Resort & Casino expuso que el señor González Soto-mayor, en una actividad en la que trabajó como mozo, omitió realizar los procedimientos de caja con relación a unas botellas de vino servidas a unos clientes durante la actividad.(8) Sobre las diversas acciones disciplinarias contra el señor González Sotomayor, el hotel enumeró las siguientes: “reiteradas omisiones en realizar sus ponches de entradas y salidas de labor correctamente, [y] negarse a asistir a su trabajo por razones injustificadas”, razón por la que fue suspendido de empleo y sueldo; actitudes negativas reiteradas contra “supervisores y compañeros de trabajo”, lo que resultó en su suspensión de empleo y sueldo, y actitudes agresivas o negativas.(9)
Enfáticamente, Mayagüez Resort & Casino alega que el despido del señor González Sotomayor no estuvo relacionado con la reunión que éste solicitó ni con alguna de sus alegaciones incluidas en la querella.(10) Plantea que el despido obedeció a razones justificadas de acuerdo con las disposiciones de la Ley Núm. 80, según enmendada, supra.(11) Es decir, que la terminación del empleo del señor González Sotomayor “estuvo motivada exclusivamente por el buen y normal funcionamiento de la empresa”. (Enfasis nuestro.)(12) Finalmente, el hotel alegó que el Tribunal de Primera Instancia no tenía jurisdicción para atender esta controversia, porque el uso por el señor González Sotomayor de la frase “actividades concertadas” en la querella, en *871 referencia a la causa de su despido, es una materia protegida por la Ley Taft-Hartley, cuya jurisdicción exclusiva recae en la NLRB.(13)
El 8 de febrero de 2007, el señor González Sotomayor presentó ante el foro de instancia un “Memorando de derecho”, donde recalca y fundamenta sus reclamaciones laborales al amparo de la Ley Núm. 80, según enmendada, supra, y la Ley Núm. 115, supra. Mientras, el 16 de marzo de 2007 Mayagüez Resort & Casino sometió una Solicitud de Desestimación de la Querella y Réplica a Memorando de Derecho.(14) Luego de evaluar la moción de desestimación
*872 presentada por el hotel, el foro de instancia la declaró “no ha lugar” el 23 de abril de 2007, porque entendió que existían “hechos medulares en controversia”. Ante este dicta-men, Mayagüez Resort & Casino sometió un recurso de certiorari ante el Tribunal de Apelaciones. Este foro judicial confirmó al tribunal de instancia el 11 de julio de 2007, *873 por entender que actuó correctamente al negarse a desestimar la querella.
Inconforme con este dictamen, el hotel recurrió ante este Tribunal argumentando que el foro apelativo cometió un error al no desestimar la demanda, a pesar de que el Tribunal de Instancia no tenía jurisdicción para entender en la controversia y porque de las alegaciones de la demanda no surgen los requisitos necesarios para que se active una reclamación sustentada en la Ley Núm. 115, supra. Por su parte, el señor González Sotomayor sometió un alegato, en el cual justificó la jurisdicción del Tribunal de Primera Instancia, expresando, entre otras cosas, lo siguiente:
El hecho de que el querellante hiciera mención en su querella del término “actividades concertadas” para identificar los hechos que dieran base a su despido, no deja al TPI sin jurisdicción. La jurisdicción del TPI o la ausencia de la misma, está enmarcada en los hechos mismos y no en la frase correcta o incorrectamente utilizada por el querellante. (Enfasis nuestro.)(15)
Sobre el segundo error señalado, el señor González Sotomayor expone, apoyándose en el caso Cintrón v. Ritz Carlton, 162 D.P.R. 32 (2004), que se configura el acto de represalia cuando un patrono procede a despedir a un empleado por éste pedir reunirse con la gerencia para discutir asuntos concernientes a su trabajo.
La opinión mayoritaria sólo se concentra en resolver cuál foro, si el tribunal de instancia o la NLRB, tiene la jurisdicción exclusiva para resolver la controversia de este caso. Luego de una breve exposición del derecho aplicable y de la discusión de figuras poco significativas en cuanto a la médula de la controversia, la opinión mayoritaria concluye que la NLRB es el foro con jurisdicción exclusiva para atender este caso, por lo cual procede a desestimar la querella por falta de jurisdicción. No podemos coincidir con ese *874 resultado y, mucho menos, suscribirlo ante la ausencia de fundamentos y análisis que lo apoyen.
II
A. Actividades concertadas en el á mbito de las relaciones obrero-patronales
La frase “actividades concertadas” se utilizó por primera vez en la Ley Norris-LaGuardia, aprobada el 23 de marzo de 1932.(16) Esta legislación laboral tiene la finalidad de prohibir a los tribunales federales que emitan órdenes de injunction en controversias relacionadas con disputas laborales pacíficas. Además, mediante esta ley, el Congreso rechazó que se incluyeran, en cualquier tipo de contrato, disposiciones que previnieran al empleado de organizarse en un sindicato o le exigieran desafiliarse de alguno.(17) Respecto a las actividades concertadas, el texto de la ley dis-pone:
Whereas under prevailing economic conditions, ... the individual unorganized worker is commonly helpless to exercise *875 actual liberty of contract and to protect his freedom of labor, ... it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aids or protection .... (Enfasis nuestro.)(18)
Posteriormente, como parte de la “Revolución del Nuevo Trato”, la administración del Presidente Franklin D. Roosevelt aprobó la National Industrial Recovery Act (NIRA) en 1933 (15 U.S.C.A. ant. see. 701 et seq.). Ésta incluía una política pública nacional laboral que favorecía la organización sindical y la negociación colectiva.(19) Como parte de esta política, se incluyó en la Sección 7(a), 15 U.S.C.A. ant. sec. 707(a), el concepto “actividades concertadas”, según aprobado en la Ley Norris-LaGuardia. Los derechos y principios contenidos en este estatuto fueron implantados por la Junta Nacional Laboral, organismo creado por esta ley.
La NIRA, sin embargo, fue declarada inconstitucional el 27 de mayo de 1935.(20) No obstante, su lenguaje sobre las actividades concertadas fue utilizado en la Sección 7 de la Ley Nacional de Relaciones Laborales de 5 de julio de 1935, mejor conocida como Ley Wagner, 29 U.S.C.A. sec. 157. Dicho estatuto laboral fomenta la práctica de la negociación colectiva y la absoluta libertad de asociación de los empleados para mejorar sus condiciones de empleo y de salario, e impulsar el libre intercambio de bienes en el comercio interestatal. Garantiza también el derecho de los trabajadores a organizarse, a escoger sus representantes, a negociar colectivamente y a celebrar huelgas y piquetes *876 pacíficos. Además, crea la Junta Nacional de Relaciones del Trabajo para que la administre.(21)
La Ley Wagner fue enmendada por la Ley Federal de Relaciones Obrero Patronales de 23 de junio de 1947, conocida como la Ley Taft-Hartley. Su política pública laboral está orientada a eliminar las causas de ciertas obstrucciones sustanciales al libre flujo del comercio interestatal, fomentando la práctica y los procedimientos de la negociación colectiva y protegiendo a los obreros en el ejercicio de su derecho a la asociación, a organizarse entre sí, a la elección y designación de sus representantes para negociar los términos y las condiciones de su empleo, y a realizar otras formas de ayuda mutua y protección.(22)
En esta legislación sobrevivió el lenguaje sobre las actividades concertadas de la Sección 7 de la Ley Wagner, supra. A esos efectos, la Ley Taft-Hartley establece:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title. (Énfasis nuestro.)(23)
Lo único diferente entre esta disposición y la contenida en la Ley Wagner es que incorporó el derecho de los trabajadores a no participar en las actividades concertadas si esa era su voluntad, sin temor a represalias.(24)
*877 La violación por parte del patrono de algunos de los derechos establecidos en la Sección 7 de la Ley Taft-Hartley, 29 U.S.C.A. see. 157, se considera una práctica ilícita y corresponde a la NLRB la jurisdicción exclusiva para atender controversias relacionadas con éstas.(25) Esto, siempre que exista un contexto de disputa obrera, el cual según la Ley Taft-Hartley sólo se suscita cuando la controversia está relacionada con los términos, la tenencia o las condiciones de empleo, o en relación con la asociación o representación de personas en la negociación, la fijación, el mantenimiento, el cambio o el esfuerzo para convenir los términos o las condiciones de empleo, independientemente de si la relación inmediata de los disputadores es la de patrono y empleado.(26) Sobre este particular, hemos establecido que “[Z]o imprescindible para determinar si una controversia constituye o no una disputa obrero-patronal[,) no es quién plantea el asunto, sino de dónde surgen los derechos reclamados”. (Enfasis nuestro.)(27)
La frase “actividades concertadas” no ha sido definida en las leyes laborales mencionadas.(28) La NLRB y los tribunales se han encargado de establecer los requisitos particulares que deben estar presentes para que una disputa laboral pueda considerarse una actividad concertada.(29) A *878 continuación, examinemos nuestra jurisprudencia y la del Tribunal Supremo federal sobre esto.
En 1964 este Tribunal resolvió el caso J.R.T. v. Morales, 89 D.P.R. 777 (1964), en el cual un patrono despidió a dos empleados por presentar una querella en el Departamento del Trabajo de Guayama, en su nombre y en representación de otros compañeros, en concepto de horas extras, trabajo realizado en el séptimo día y diferencias en salarios. Esta querella fue archivada, por un lado, porque el patrono evidenció que había pagado los séptimos días trabajados y, por otro lado, porque los empleados no aportaron prueba respecto al reclamo de horas extras. Posteriormente, el Sindicato de Obreros Unidos del Sur presentó en la Junta de Relaciones del Trabajo de Puerto Rico un cargo por práctica ilícita contra el patrono por éste haber despedido a los empleados por su participación en actividades concertadas.
La Junta de Relaciones del Trabajo de Puerto Rico favoreció a los empleados y ordenó que se les repusiera y se les compensara los salarios dejados de devengar, más los intereses correspondientes. No obstante, revocamos a la Junta porque entendimos que no se le puede imputar una práctica ilícita del trabajo según el Artículo 8(l)(a) de la Ley Núm. 130 de 8 de mayo de 1945, conocida como Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69(l)(a), a un patrono que actúa en forma discriminatoria contra unos empleados, cuando éste no tenía conocimiento de las actividades concertadas realizadas por los obreros ni podía inferir su existencia de las circunstancias o de la situación prevaleciente en el lugar de trabajo.(30) Además, aclaramos que una actividad concertada no está limitada al ámbito de la negociación colectiva y sólo está protegida si no constituye un acto ilegal, violento, en violación del convenio o indefendible, por constituir una deslealtad al patrono, innecesaria para realizar actividades concertadas legítimas que consistan de imputaciones incorrectas he *879 chas deliberadamente, con intención de falsificar, perjudicar maliciosamente al patrono o que sean difamatorias, insultantes o manifiestamente destructivas de la disciplina.(31)
Más adelante, en J.R.T. v. Escuela Coop. E.M. de Hostos, 107 D.P.R. 151 (1978),(32) resolvimos que no constituye una actividad concertada la huelga que 28 maestros de la cooperativa realizaron en protesta por el despido de la directora del plantel escolar. Resaltamos que la misma directora había presentado su renuncia ante la Junta de Directores del Plantel, éstos la aceptaron y, posteriormente, se negaron a aceptar que la directora la retirara. Entendimos, igual que la Junta de Relaciones del Trabajo, que la huelga carecía de toda legitimidad gremial porque fue un movimiento aislado y desvinculado de las actividades concertadas encaminadas a organizar una unión independiente.(33)
En otras palabras, no existía un nexo claro entre la gestión sindical para mejorar las condiciones de trabajo y el paro dirigido a cuestionar la prerrogativa gerencial de la Junta de Directores del patrono a escoger sus supervisores e imponer su criterio al seleccionar un director de escuela. En ese sentido, la huelga era ilegal y vulnerable del requerimiento a los empleados de sus obligaciones contractuales. Por lo tanto, el patrono no violó la Sección 7 de la Ley ni cometió una práctica ilícita de trabajo al despedir.(34)
Más recientemente, en 1992, resolvimos el caso P.R.T.C. v. Unión Indep. Emp. Telefónicos, 131 D.P.R. 171 (1992). La controversia en este caso se orientaba a determinar si era válida una norma del patrono (P.R.T.C.) que, en medio de la negociación del nuevo convenio colectivo, prohibía a sus *880 empleados que tenían contacto con el público colocar en sus uniformes el mensaje “Convenio Colectivo Ahora”. Esta norma sobre el uso de uniformes y sus leyendas o insignias fue aprobada por el patrono cuando venció el convenio vigente y antes de que se firmara el nuevo. La unión, por su parte, estaba usando las leyendas para presionar al patrono a que firmara el convenio. Además de esta iniciativa, la unión había desarrollado otras actividades concertadas, como piquetes, marchas, conferencias de prensa y otras comparecencias públicas. Varios de los empleados fueron suspendidos por incumplir la norma sobre las leyendas.
La unión presentó ante el tribunal de instancia una demanda de injunction, sentencia declaratoria y daños contra el patrono, aduciendo que la prohibición constituía una censura previa y una supresión total al derecho de expresión. De igual forma, presentó cargos de práctica ilícita de trabajo ante la Junta de Relaciones del Trabajo, fundamentados en el Art. 8(l)(a) y (c) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69(l)(a) y (c). La unión alegó que la prohibición del patrono coartaba el derecho de los empleados a realizar actividades concertadas de forma ordenada, pacífica y sin alusiones de deslealtad o lenguaje soez o belicoso al amparo del Art. 4 de la Ley de Relaciones del trabajo de Puerto Rico, 29 L.P.R.A. see. 65. La Junta de Relaciones del Trabajo emitió una decisión y orden con la que instruyó al patrono que cesara y desistiera de interferir con los derechos garantizados por la ley, específicamente el de realizar actividades concertadas para negociar colectivamente u otro fin de ayuda o protección mutua. También le ordenó pagar los salarios que los empleados dejaron de percibir.
Al evaluar los hechos del caso, entendimos que el uso de leyendas era una acción concertada, para propósitos de ayuda mutua o protección de los empleados, protegida por la Ley de Relaciones del Trabajo, con independencia de que con su acción los obreros ejercieran, además, su derecho *881 constitucional a la libre expresión de ideas.(35) Llegamos a esta conclusión porque la actividad concertada realizada se caracterizó por lo siguiente: (1) estar relacionada con los términos y las condiciones de empleo que se estaban negociando; (2) realizarse para buscar el apoyo de todos los unionistas; (3) tener el propósito de buscar el apoyo del público; (4) crear presión psicológica contra el patrono; (5) buscar un remedio específico; (6) tener un propósito legal, y (7) utilizar medios legales para su consecución.(36) También, en esa ocasión expresamos que, contrario a la jurisdicción federal, en Puerto Rico la protección de las actividades concertadas tiene raíces constitucionales.(37)
Ahora examinemos el análisis que ha realizado el Tribunal Supremo de Estados Unidos sobre la figura “actividades concertadas”. Este es, evidentemente, un referente altamente persuasivo.
En Labor Bd. v. Washington Aluminum Co., 370 U.S. 9 (1962),(38) unos empleados abandonaron su trabajo sin permiso porque estaba muy frío para trabajar en el taller para la construcción de herramientas de Washington Aluminum Co., en Baltimore. En ocasiones anteriores, los empleados se habían quejado de las condiciones en que estaban realizando su labor. El día de los hechos, el 5 de enero, la calefacción del lugar se había dañado y la temperatura de invierno bajó extraordinariamente.(39) El patrono despidió a los empleados por su acción.
La NLRB determinó que la conducta de los empleados estaba protegida como actividad concertada bajo la Sección *882 7 de la Ley Nacional de Relaciones Laborales, supra, y que el despido era una práctica ilícita bajo la Sección 8(a)(1) de esta ley, 29 U.S.C.A. sec. 158(a)(1). También, la NLRB concluyó que la acción concertada en este caso nació de una disputa laboral, donde los empleados protestaban porque la compañía no les suplía una calefacción adecuada en su lugar de trabajo.(40)
El Tribunal Supremo federal concluyó que los empleados no tenían que hacer una demanda específica a su patrono antes de marcharse para que la acción estuviera cobijada por la Sección 7, supra, máxime cuando no tenían un representante exclusivo seleccionado.(41) La determinación del máximo foro federal se basó en que el lenguaje de la referida Sección 7 es tan amplio que considera como actividades concertadas aquella que ocurra antes, después o en el mismo momento en que se origina la queja, demanda o exigencia de los trabajadores. Por esta razón, ordenó que los trabajadores fueran restituidos en su trabajo.(42)
No obstante, el Tribunal hace constar que las actividades concertadas, para que estén protegidas por la Sección 7, supra, no pueden ser ilegales ni violentas, no pueden incumplir con el contrato ni pueden ser indefendibles por considerarse desleales al patrono e innecesarias para realizarlas.(43) También aclara que no toda actividad que perjudique al patrono pierde la protección de la Sección 7, supra.
*883 En 1978,(44) en un contexto de relaciones laborales colectivas, es decir, bajo la existencia de un sindicato y relaciones laborales reguladas por un convenio colectivo, el Tribunal Supremo federal resolvió que un patrono cometía una práctica ilícita al no permitir la distribución de un periódico de la unión en las áreas donde no se ejecutaba el trabajo y en las horas libres de los empleados. En concreto, en el periódico se le pedía a los trabajadores que apoyaran dos asuntos de su interés y de preocupación para su unión, y que, además, discutieran una propuesta para: (1) la incorporación de la ley de “derecho a trabajar” en la Constitución, y (2) un veto presidencial al aumento del salario mínimo federal.
Luego de evaluar los hechos del caso, el Tribunal determinó que la distribución del periódico era una acción concertada, para fines de “ayuda mutua y protección”, protegida por las Secciones 7 y 8(a)(1) de la Ley Taft-Hartley, supra. Según el Tribunal, la preocupación de la unión por la legislación analizada en el periódico tenía la intención de proteger los intereses de sus miembros dentro del concepto de “ayuda mutua y protección”, y los temas discutidos en el periódico podrían tener un impacto significativo en la fuerza de la unión durante las negociaciones, específicamente en los niveles de salarios negociados con el patrono. En fin, el Tribunal decidió que los empleados no pierden la protección de la Ley Taft-Hartley aunque utilicen canales que estén fuera de la relación obrero-patronal inmediata —como lo era el periódico en este caso— siempre y cuando éstos estén tratando de mejorar los términos y las condiciones de empleo o de incrementar sus beneficios como empleados. En otras palabras, se reconoció que los empleados pueden utilizar medios no tradicionales para avanzar aquellas causas, no relacionadas con la negociación colectiva y los procedimientos de quejas y agravios, presentes en el contexto de su trabajo. Esto debido a que la política *884 pública de la Ley Taft-Hartley está dirigida a “protect the right of workers to act together to better their working conditions”.(45)
Bajo la temática de acción individual de un empleado, en 1975,(46) el Tribunal Supremo federal resolvió que un patrono comete una práctica ilícita de trabajo, según la Sección 8(a)(1) de la Ley Taft-Hartley, supra, si impide que un representante sindical esté presente en una entrevista investigativa. Sin embargo, el Tribunal Supremo aclaró que esta norma no aplica en cualquier tipo de conversación que pueda tener el patrono con el empleado, sino en aquella que tenga la potencialidad de una acción disciplinaria contra una obrera. En ese caso, se le imputó a una empleada de una cafetería el pagar menos dinero por la compra de su almuerzo.
La decisión estriba en que la participación del representante sindical le garantiza, tanto al empleado solicitante como al resto de la unidad apropiada, que la unión vigila sus derechos de seguridad de empleo y está enfocada en protegerlos contra los castigos abusivos por parte del patrono. La premisa es que de la misma forma en que se interviene a favor de este empleado, también se hará para el resto de los miembros de la unidad apropiada que puedan enfrentar situaciones similares.(47) Además, el Tribunal señaló que la Ley Taft-Hartley está designada para eliminar la inequidad entre el poder de negociación de empleados y patronos. En ese sentido, el requerir a un empleado que participe solo en una entrevista investigativa —que puede resultar en la imposición de cargos disciplinarios en su contra— lo que hace es perpetuar la inequidad que la ley quiso eliminar.(48)
*885 El caso NLRB v. City Disposal Systems, Inc., 465 U.S. 822 (1984), también se ubica dentro del tópico de acciones individuales de empleados. Aquí un camionero fue despedido por negarse a conducir un camión que él entendía, honesta y razonablemente, que tenía los frenos defectuosos. El convenio que protegía al camionero garantizaba su derecho a rehusarse a conducir camiones que tuvieran desperfectos. Su unión no quiso representarlo y tuvo que recurrir solo a la NLRB para presentar contra su patrono una reclamación de práctica ilícita por violación al Artículo XXI del Convenio Colectivo. La NLRB encontró que el despido fue injustificado y que el camionero había realizado una actividad concertada dentro de la definición de la Ley Nacional de Relaciones Laborales.
El Tribunal Supremo federal restituyó al camionero en su puesto y dictaminó que se le pagaran los salarios dejados de percibir. En términos generales, coincidió con la NLRB en que un solo empleado que reclama un derecho protegido por un convenio colectivo puede efectuar una actividad concertada.(49) Esta conclusión se sostiene en dos justificaciones: (1) hacer valer un derecho contenido en un convenio es una extensión lógica de la acción concertada que produjo el contrato colectivo, y (2) hacer valer ese derecho afecta los derechos de todos los empleados cubiertos por el convenio colectivo. Entendió el Tribunal que este efecto generalizado es suficiente para colocar las acciones individuales de un empleado dentro de la protección brindada por el estándar de ayuda mutua y protección, provisto por la Sección 7, supra.(50)
*886 El Tribunal Supremo federal reconoció que la frase “actividades concertadas” se ha definido rutinariamente como todas las actividades de empleados en las que éstos se han unido con el propósito de lograr unas metas comunes.(51) No obstante, aclaró que la Sección 7, supra, no se limita a acciones donde dos o más empleados se unen en un mismo tiempo y lugar para lograr un propósito común. Respecto al apoyo a una organización laboral, estableció que un solo trabajador puede realizar esta acción y que tal actuación también es “concertada”. Concretamente, el acto de que to-dos se organicen, irrespectivamente de cuándo se realice, es decir, el acto de la asamblea y la posterior unión de otros empleados, es una acción integral y, por lo tanto, debe ser reconocida como una actividad concertada. No tendría sentido formar un sindicato si otros empleados no pudieran unirse posteriormente. La acción de formar un sindicato es parte integral de la actividad de unirse a éste, de la misma forma que la negociación de un convenio colectivo está integralmente relacionada con la invocación de un derecho provisto en el acuerdo. En ambos casos, ni la actividad colectiva ni la individual estarían completas sin el acontecer de la otra.(52)
Un balance de la jurisprudencia revisada nos devela que las actividades concertadas, protegidas por la Sección 7 de la Ley Tafb-Hartley, tienen que ser una expresión de voluntad de los trabajadores para lograr unas metas comunes con el propósito de mejorar sus condiciones de trabajo. Estas actividades las pueden realizar uno o varios empleados, pues lo importante es que la acción represente el inte *887 rés del colectivo obrero. El autor Francisco Velázquez lo resume muy bien al definir el concepto “actividad concertada” como los “esfuerzos combinados de los trabajadores con el propósito de defender sus intereses, reclamar sus derechos o de ayudar a otros trabajadores en sus demandas”.(53)
B. Criterios para Activar la Jurisdicción Exclusiva de la NLRB
Es importante señalar que para resolver la controversia que se encuentra ante la consideración de este Tribunal no es necesario expresarnos sobre la jurisdicción exclusiva de la NLRB. Si no existe una actividad concertada es fútil tal ejercicio jurídico. No obstante, como la opinión mayoritaria insiste en que el foro judicial no tiene jurisdicción en este caso, nos vemos precisados a clarificar cuándo es que se activa la jurisdicción exclusiva de la NLRB. Notamos entonces que, distinto a lo que plantea la mayoría, el desplazamiento jurisdiccional no es automático y el análisis de esta doctrina es mucho más complicado.
En el ámbito laboral, la doctrina de desplazamiento está fundamentada en la National Labor Relations Act (NLRA), legislación que se mantiene como el centro de la política laboral federal. Sin embargo, el Congreso no incluyó cláusulas expresas de desplazamiento en la NLRA.(54) Por esto, los tribunales han asumido la difícil tarea de definir si la jurisdicción para atender una controversia obrero-patronal debe recaer en los tribunales estatales o en el gobierno federal a través de la NLRB.
En otras palabras, los tribunales han tenido que elaborar criterios que permitan establecer cuándo aplica la doctrina de desplazamiento en el contexto laboral. En este análisis el elemento primordial es la conducta y no el re *888 medio solicitado.(55) Como bien señala la mayoría, tal apreciación fue recientemente considerada por este Tribunal en Díaz Arroyo v. Hosp. Dr. Susoni, 169 D.P.R. 53 (2006).(56)
Como regla general,(57) se ha establecido que se activa la doctrina de desplazamiento cuando están presentes cual *889 quiera de estas consideraciones: (1) los estados reglamentan la conducta que está realmente protegida o prohibida por la NLRA; (2) los estados reglamentan la conducta que es probable o razonablemente (“arguably”) protegida o prohibida por la NLRA; (3) la causa de acción ante los tribunales se sustenta en una conducta que es realmente protegida o prohibida por la NLRA; (4) la causa de acción ante los tribunales se fundamenta en una conducta que es probable o razonablemente (“arguably”) protegida o prohibida por la NLRA, y (5) cuando se proscriben causas de acción basadas en la reglamentación estatal o en las leyes estatales que conciernen a la conducta que el Congreso ha tenido la intención de no regular y que ha querido que se mantenga entre los remedios de autoayuda disponibles a las partes en la disputa laboral.(58) La finalidad que persigue esta norma de desplazamiento no es prohibir que los estados legislen o que los tribunales se queden sin jurisdicción en cuanto a toda conducta protegida o prohibida por la NLRA.(59) Por el contrario, el propósito es ofrecer a los trabajadores un remedio a través de un foro adecuado, evitando conflictos en la interpretación de la normativa obrero-patronal y manteniendo la uniformidad para posibilitar su aplicación continua a las controversias laborales.(60)
El Tribunal Supremo federal ha discutido cómo las cortes estatales pueden determinar si una actividad está probable o razonablemente cobijada o prohibida por la NLRA, de manera que esté bajo la jurisdicción exclusiva de la
NLRB. En concreto, el máximo foro federal ha definido el concepto “arguably” de la forma siguiente:
*890 If the word “arguably is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been “authoritatively rejected” by the courts or the Board. ... The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation. (Enfasis nuestro.)(61)
Es necesario, pues, que la parte que levanta la defensa de falta de jurisdicción sobre la materia presente argumentos convincentes y consecuentes. Los tribunales no pueden adjudicar una controversia jurisdiccional exclusivamente a base de meras alegaciones de la parte demandante. Incluso, en términos de las relaciones obrero-patronales, la parte que levante la defensa de falta de jurisdicción debe demostrar que la NLRB asumirá jurisdicción y resolverá el caso a su favor.(62)
Es importante resaltar que una alegación que aluda a la frase “acción concertada” no es lo mismo que la alegación de una conducta. Una conducta es la manera de proceder de un individuo en relación con los demás; es un comportamiento.(63) Para que la alegación de un concepto jurídico complejo y técnico, como el de actividad concertada, se convierta en la alegación de una conducta, hay que *891 referirla a hechos particulares que, de probarse, constituirán la acción.
La mayoría alude al caso Vargas v. Molinos Nacionales, Inc., 134 D.P.R. 919 (1993), y expone que en esa ocasión resolvimos desestimar el caso por falta de jurisdicción fundamentándonos en las alegaciones de la parte demandante. Sin embargo, este caso se distingue fácilmente del que hoy se encuentra ante nuestra consideración, pues Vargas sucede en el contexto de una organización sindical y un convenio laboral. Uno de los codemandados era una unión y contra ésta se reclamó que faltó al deber de la justa representación.
No podemos obviar que la determinación apresurada de un cuestionamiento jurisdiccional puede dejar sin remedio a una parte. En lo que a nosotros concierne, el Tribunal Supremo federal ha reconocido que la intención del Congreso al aprobar la NLRA no era privar de remedios a las partes. Por eso, cuando la NLRB, como foro, no puede ofrecer un remedio, es improcedente determinar que los tribunales no tienen jurisdicción para atender la controversia.(64) Más aún, corresponde al foro judicial pasar juicio sobre un planteamiento de falta de jurisdicción sobre la materia. Al respecto, el Tribunal Supremo federal determinó: “when a claim of Garmon pre-emption is raised, it must be considered and resolved by the state court.”(65)
J—I h-H !—I
La opinión mayoritaria resuelve que este Tribunal no tiene jurisdicción para atender la controversia que está ante nuestra consideración. Disentimos. El eje central de esta determinación es el concepto “actividad concertada”. Sorpresivamente, la opinión mayoritaria asume la existen *892 cia de una actividad concertada sin definir esta figura jurídica, sin aplicar las características del concepto a los hechos y sin contar con un expediente que sustente su apreciación. Sólo se utilizan las alegaciones iniciales del señor González Sotomayor como concluyentes de su posición de que existía dicha “actividad concertada”.
En consecuencia, la opinión mayoritaria asume, en primer lugar, que existe una práctica ilícita por parte del Mayagüez Resort & Casino al interferir con la formación de una organización laboral, según la Ley Taft-Hartley; asume, también, la existencia de una campaña de organización sindical liderada por el señor González Sotomayor, y por último, asume que el despido del señor González Soto-mayor fue motivado por actitudes antisindicales del Mayagüez Resort & Casino. Estas erróneas consideraciones sustentan su determinación de que la jurisdicción exclusiva recaía en la NLRB.
Contrario a la mayoría, pienso que la mera mención por el señor González Sotomayor del concepto jurídico “actividad concertada” no puede ser suficiente para resolver que el foro judicial no tiene jurisdicción para atender este caso. Del expediente que está ante nuestra consideración no surge que el señor González Sotomayor realizó una acción concertada y el propio patrono Mayagüez Resort & Casino planteó la defensa de falta de jurisdicción, rechazando categóricamente que el despido haya sido el resultado de una actividad concertada. En este contexto, no se cumple con el estándar de una conducta probable o razonablemente (“arguably”) protegida o prohibida por la NLRA, que active la jurisdicción exclusiva de la NLRB.
Para salvar esta situación, es necesario que puntualicemos en las características que definen la frase “actividades concertadas” en el campo de las relaciones obreropatronales. Estas se derivan de la jurisprudencia previamente discutida y nos revelan que las acciones concertadas pueden darse en el ámbito colectivo o individual, ya sea para proteger los derechos de los obreros a organizarse para negociar colectivamente con su patrono o para esta *893 blecer términos y condiciones de empleo que sean de ayuda mutua y de protección a los obreros. Algunas manifestaciones de las actividades concertadas en el ámbito individual son: la defensa de un acuerdo consignado en un convenio, la afirmación del derecho de los trabajadores o en su representación, el apoyo a las acciones de un sindicato o simplemente el acto de afiliarse a un sindicato.
Sin importar el ámbito en el cual se suscite la acción concertada, para cualificarla como tal, ésta debe cumplir con las características siguientes: (1) debe haber una disputa laboral; (2) debe estar dirigida a mejorar unas condiciones de trabajo; (3) debe existir un reclamo de un derecho específico, no puede limitarse a quejas y es importante conocer de dónde surgen esos derechos reclamados; (4) no puede intervenir ni ser un reclamo privado a una prerrogativa gerencial; (5) debe realizarse en representación, ayuda mutua y protección del resto de los trabajadores; (6) pueden ocurrir antes, después o en el mismo momento en que se origina la demanda de los trabajadores, y (7) no requiere el permiso del patrono para llevarse a cabo. Además, en nuestra jurisdicción son acciones protegidas constitucionalmente.
Es importante señalar que no todas las actividades concertadas están protegidas por la Ley Taft-Hartley. Esta protección se puede perder dependiendo de la forma en que se realice la actividad y su propósito. Por eso, las actividades concertadas, para que sean válidas, deben ser actos legales, fundamentados en un propósito legal. Deben, además, utilizar medios legales en su consecución, es decir, tienen que ser actos pacíficos y ordenados. Su manifestación no puede representar una violación del contrato. Tampoco pueden ser xana actuación indefendible, por constituir ama deslealtad al patrono, innecesaria para realizar la actividad concertada legítima. En otras palabras, las actividades concertadas no pueden consistir de imputaciones incorrectas, hechas deliberadamente o con la intención de falsificar o peijudicar maliciosamente al patrono. De igual forma, no deben resultar difamatorias, insultantes o mani *894 fiestamente destructivas de la disciplina a la que aspira un patrono.
Al examinar el expediente de este caso, es obligatorio concluir que no están presentes ningunas de las características que conforman la figura jurídica denominada “actividad concertada”. No existe una disputa laboral, según ésta se define en la Ley Taft-Hartley. Lo único que se evidencia del expediente es la celebración de una reunión pautada por la gerencia de Mayagüez Resort & Casino, a petición de dos empleados interesados en adelantar sus intereses particulares. Fue una reunión donde sólo dos empleados expresaron quejas dirigidas a cuestionar las prerrogativas gerenciales sobre la distribución de las horas de trabajo entre los meseros de mayor antigüedad que había desarrollado la administración del hotel. Tal apreciación se manifiesta de las expresiones del señor Betances López y la señora Estrella:
[Betances López:] Que no quiere hablar por nadie[,] que está hablando sólo por [é]l y lo que entiende debe mejorar. Que cuando él comenzó a laborar como mesero estaba en un listado y era de los últimos y entendía que cuando llevara muchos años[,] como ahora[,] le estarían dando más trabajo que a los nuevos. Que lo que ocurre es que el trabajo lo están distribuyendo equitativo para todos [,] no importa si lleva poco o mucho tiempo. Considera injusto que después que a él le pasó eso, para los nuevos ahora es más fácil. Raymond indica que siente mucho orgullo de trabajar aquí y le gusta.
Se le pregunta a todos los demás empleados si tienen algún comentario y sólo Rosa Estrella tomó la palabra:
[.Estrella:] Relativamente tiene la misma queja de Raymond. [E]sta añadió que se sentía incómoda con relación al incidente que hubo de una cartera desaparecida.(66)
Es evidente que esta reunión fue rutinaria, donde se atendieron problemas y preocupaciones recurrentes en cualquier lugar de trabajo. No se evidencia una disputa obrera ni una reclamación en específico para adelantar el interés de todos los trabajadores. Estas quejas no pueden catalogarse como actividades concertadas bajo las defini *895 dones de la Ley Taft-Hartley. ¿Acaso la actividad concertada fue la celebración de una reunión donde participaron empleados y gerenciales?
Para que una actividad individual de un trabajador pueda ser considerada una actividad concertada, tiene que tener el propósito claro de adelantar los intereses del colectivo de trabajadores. ¿Cómo se logra esto en el escenario anterior, donde un grupo de empleados de mayor antigüedad recaba que el patrono les asigne las horas extra de trabajo en perjuicio de los empleados más jóvenes? En concreto, esta solicitud va contra la nueva práctica del patrono de distribuir equitativamente las horas de trabajo para limitar el pago de tiempo extra y proteger el empleo de todos los meseros. No puede ser considerada una acción concertada el intento de una minoría de reducir la seguridad de empleo de sus compañeros de trabajo. Al respecto, el señor Muñoz, uno de los gerentes, expuso:
[É]ste le indica a Raymond Bet[a]nces que en el pasado por estar favoreciendo a los empleados con mayor “seniority” se causaba mucho sobre tiempo. Que quiz[á]s al principio fue de esa manera[,] pero dio instrucciones de que el trabajo se distribuyera para evitar el sobre tiempo. Además, teníamos otro problema y era la poca retención de meseros de banquetes por falta de trabajo.(67)
Se demostró que los quejosos salieron satisfechos de la reunión con las explicaciones que les ofreció la administración del hotel. También se evidencia que el resto de los empleados estaba contento con su trabajo.
Todos los demás empleados sólo comentaron que se sentían a gusto y [que] venían a trabajar.
El Sr. Raymond Bet[a]nces y la Sra. Rosa Estrella mostraron entendimiento a las razones que la gerencia le proveyó sobre las alegaciones.(68)
Los reclamos de uno o varios empleados a la gerencia, en cuanto a sus condiciones individuales de trabajo, su sa *896 lario o beneficios marginales, sin referencia o preocupación alguna al interés del resto de los empleados, no puede dar margen a que se cataloguen estos reclamos como actividades concertadas cubiertas en forma exclusiva según las disposiciones de la Ley Taft-Hartley. La inevitable consecuencia de esa ecuación es que los tribunales en Puerto Rico no tendrían jurisdicción en ningún asunto que tenga que ver con reclamos similares donde alguno de los reclamantes sea despedido.
Por otro lado, la opinión mayoritaria asume, además, que el despido del empleado fue una acción antisindical de Mayagüez Resort & Casino, a pesar de que el expediente no sustenta tal afirmación. Contradictoriamente, el legajo del caso refleja que el mismo patrono alegó que el despido del señor González Sotomayor fue motivado por otros asuntos no relacionados con la alegada actividad concertada. En concreto, alegó que había sido despedido por su historial disciplinario.(69) Incluso, para validar su posición, el patrono incorpora una porción de una deposición en la cual el empleado declara que fue despedido por un alegado mal funcionamiento en su trabajo.(70)
También, la opinión mayoritaria asume que el Mayagüez Resort & Casino conocía las intenciones de González Sotomayor de organizar a los empleados de su departamento y que por eso fue que lo despidió. A esta conclusión se llega sin que del expediente surja que Mayagüez Resort & Casino conocía o debía conocer sobre las alegadas actividades concertadas del señor González Sotomayor, dirigidas a organizar a sus compañeros empleados de su departamento.
En el caso que nos ocupa, la decisión mayoritaria dejaría sin un remedio al señor González Sotomayor, porque al recurrir a la NLRB, este ente administrativo desestimará también la controversia, ya que no existe una acción pro *897 tegida o prohibida, es decir, no hay una actividad concertada que active la jurisdicción exclusiva de la NLRB. La controversia de este caso no se resuelve con una norma contenida en la NLRA, sino con nuestra legislación sobre despido injustificado o represalias.
Este Tribunal tiene la responsabilidad indelegable de asumir jurisdicción cuando, en efecto, la tenga. Esto es parte del delicado balance de impartir justicia. La decisión de no asumir jurisdicción debe ser el resultado de una ponderación cuidadosa de las leyes, la controversia y el expediente del caso que esté ante nuestra consideración. De esta forma, podremos proveer el remedio que le corresponde en derecho a las partes en controversia. Por carecer la opinión mayoritaria de esta ponderación, disiento. Determinaría, en vez, que el foro judicial tiene jurisdicción para atender esta controversia y devolvería el caso al Tribunal de Primera Instancia para que determine si el despido del señor González Sotomayor fue justificado.

 Apéndice III del Alegato de la parte recurrida.

 íd.

 Apéndice de la Petición de certiorari, pág. 9.

 Id.

 íd.

 Id., pág. 10. No obstante, en un fragmento de la deposición tomada al señor González Sotomayor, éste expresó que su despido estaba relacionado con un mal funcionamiento que realizó, mientras trabajaba como mesero en una actividad de tríos realizada por el hotel. En específico, en la deposición el señor González Soto-mayor manifestó lo siguiente:
“Ledo. Lugo: ¿Cómo fuiste despedido?
“Deponente: Pues, fui despedido porque hice .... Por un mal funcionamiento que hice.
“Ledo. Lugo: ¿Específicamente qué?
“Deponente: Que no abrí un cheque [o una cuenta] del cliente. O sea, le pedí al “bartender” que me despachara una bebida y que supuestamente no había abierto el cheque.” (Enfasis nuestro.) Apéndice de la Petición de certiorari, pág. 53.

 Apéndice de la Petición de certiorari, pág. 13.

 íd., pág. 17.

 íd.

 íd., pág. 18.

 íd.

 íd., pág. 22. También, Mayagüez Resort & Casino alegó que el despido del señor González Sotomayor se debió a que “éste no rindió su trabajo en forma eficiente y adecuada conforme a las normas, reglamentos o instrucciones del patrono”, íd., pág. 25.

 Apéndice de la Petición de certiorari, pág. 23. Véase, además, id., pág. 47.

 Mayagüez Resort & Casino expresó en su petición de certiorari que la moción presentada ante el Tribunal de Primera Instancia se sustentó en la Regla 10.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, es decir, que era una moción para que se dictara sentencia por las alegaciones. En ésta expuso que no estaban en este caso los requisitos necesarios para que se activara la protección laboral que concede la Ley Núm. 115 de 20 de diciembre de 1991 (29 L.P.R.A. see. 194 et seq.) y que el Tribunal de Primera Instancia no tenía jurisdicción para atender la controversia, puesto que las alegaciones que el señor González Sotomayor plantea en su querella constituyen violaciones de derechos y protecciones que emanan de la Ley Taft-Hartley, cuya jurisdicción le compete exclusivamente a la Junta Nacional de Relaciones del Trabajo (NLRB, por sus siglas en inglés). En otras palabras, sustentó su moción en la defensa de que el señor González Sotomayor no expuso una reclamación que justificara la concesión de un remedio y en la falta de jurisdicción sobre la materia. Ambas defensas pudieron ser sometidas mediante una moción de desestimación bajo la Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, siempre que ésta se haya presentado antes de alegar. No obstante, como Mayagüez Resort & Casino sometió la moción luego de contestar la querella, la única opción para levantar ambas defensas antes del juicio era la moción bajo la Regla 10.3 de Procedimiento Civil, supra. Regla 10.3 de Procedimiento Civil, supra. Esto, porque la moción para que se dicte sentencia por las alegaciones requiere que se hayan presentado todas las alegaciones antes de que ésta se someta. 32 L.P.R.A. Ap. Ill, R. 10.3.
Al evaluar este tipo de moción, hemos resuelto que sólo se podrá dictar sentencia por las alegaciones si no existen hechos materiales en controversia y el promovente tiene razón, como cuestión de derecho. Cía. de Desarrollo Comer, v. American Fruits, 104 D.P.R. 90, 94 (1975); Rivera v. Otero de Jové, 99 D.P.R. 189, 195 (1970). Además, hemos establecido que cuando una parte demandada solicita que se dicte sentencia por las alegaciones al amparo de la Regla 10.3 de Procedimiento Civil, supra, el foro judicial debe estimar como admitidos todos los hechos bien alegados en la demanda y las inferencias que de éstas puedan hacerse. Montañez v. Hosp. Metropolitano, 157 D.P.R. 96, 105 (2002); Rivera v. Otero de Jové, supra, pág. 195. Sólo “se desestimará la acción si el promovente no tiene derecho a remedio alguno bajo cualesquiera hechos que pueda probar en juicio”. Montañez v. Hosp. Metropolitano, supra, pág. 105.
Un dato importante es que la moción sometida por Mayagüez Resort & Casino estaba acompañada de un documento. Específicamente, el hotel incluyó una porción de una deposición tomada al señor González Sotomayor para justificar o validar su alegación de que el despido fue por una cuestión puramente disciplinaria. Apéndice de la Petición de certiorari, págs. 53-55. La Regla 10.3 de Procedimiento Civil, supra, *872 posibilita el que una moción para que se dicte sentencia por las alegaciones se convierta en una moción de sentencia sumaria si viene acompañada de una documentación para sustanciar lo argumentado.
Ante este tipo de moción, el foro judicial tiene la responsabilidad de analizar los documentos que acompañan la solicitud de sentencia sumaria, los de la oposición —si se presentaron— y todos los otros documentos que obren en el expediente. A base de esto, el tribunal debe determinar si el oponente de la moción controvirtió algún hecho material y si los documentos no han refutado o controvertido alguna alegación de la demanda. Analizados todos estos criterios, el tribunal no dictará sentencia sumaria cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que acompañan la moción una controversia real sobre algún hecho material o esencial, o (4) como cuestión de derecho, no procede. Vera v. Dr. Bravo, 161 D.P.R. 308, 333-334 (2004); PFZ Prop., Inc. v. Gen. Acc. Ins. Co., 136 D.P.R. 881, 913-914 (1994). En este proceso de análisis, el tribunal tiene que analizar los hechos de la forma más favorable a la parte que se opone a ella y emitirá sentencia a favor de la parte a la cual le asiste el derecho. Soc. de Gananciales v. Vélez & Asoc., 145 D.P.R. 508, 526 (1998). Cualquier duda sobre la existencia de una controversia sobre los hechos medulares del caso deberá resolverse contra la parte que la solicita. Rosario v. Nationwide Mutual, 158 D.P.R. 775, 780 (2003); Asoc. Pesc. Pta. Figueroas v. Pto. del Rey, 155 D.P.R. 906, 924 (2001); García Rivera et al. v. Enríquez, 153 D.P.R. 323, 338 (2001). En definitiva, la sentencia sumaria sólo debe dictarse en casos claros, donde no se planteen controversias de interés público, se cuestione la credibilidad o existan elementos subjetivos de intención, propósitos mentales o negligencia. Jusino et als. v. Walgreens, 155 D.P.R. 560, 578 (2001); Soto v. Hotel Caribe Hilton, 137 D.P.R. 294, 301 (1994); Consejo Tit. C. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538, 549 (1991); Corp. Presiding Bishop CJC of LDS v. Purcell, 117 D.P.R. 714, 721 (1986).
El tribunal de instancia pudo considerar la moción presentada por Mayagüez Resort & Casino como una moción para dictar sentencia por las alegaciones o, quizás, debido al documento incluido, pudo pensar que realmente se trataba de una moción de sentencia sumaria. Una consideración similar pudo haber realizado el tribunal apelativo. La distinción entre ambas mociones es que la primera “únicamente procede cuando no hay hechos en controversia en las alegaciones”, mientras que la segunda “procede aun cuando de las alegaciones existan hechos en controversia, si la parte que la promueve puede demostrar, que aun cuando de las alegaciones surja una aparente controversia, en el fondo, penetrando hasta la sustancia probatoria, esa controversia no existe”. R. Hernández Colón, Práctica jurídica de Puerto Rico: derecho procesal civil, San Juan, Ed. Lexisnexis, 2007, pág. 237. No importa cuál fue la moción considerada por los tribunales, pues el resultado sería el mismo. Es decir, se tenía que denegar la moción porque las defensas en derecho presentadas por Mayagüez Resort & Casino eran improcedentes. El foro judicial tiene jurisdicción sobre esta controversia y existe un remedio en ley para la reclamación del señor González Sotomayor. El fundamento para este análisis será discutido en la Parte II de esta opinión.

 Alegato de la parte recurrida, 22 febrero de 2008, pág. 3.

 Véase 29 U.S.C.A. sec. 102. Sobre el particular, el Tribunal Supremo federal expresó:
“Congress modeled the language of [Sec.] 7 after that found in § 2 of the NorrisLaGuardia Act... which declares that it is the public policy of the United States that workers ‘shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of... representatives or in self organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ....’ ” Eastex, Inc. v. NLRB, 437 U.S. 556, 565 esc. 14 (1978). También, véanse: Meyers Industries, 268 NLRB 493 (1984); B. Glenn George, Divided We Stand: Concerted Activity and the Maturing of the NLRA, 56 (Núm. 3) Geo. Wash. L.Rev. 509, 521 (marzo 1988). En este artículo se mencionó lo siguiente:
“Several commentators offer extensive analyses of section 7’s legislative history in efforts to ferret out the true intent of the ‘concerted activities’ language. This critical terminology was taken from an equivalent provision in the NLRA’s predecessor, the National Industrial Recovery Act. The National Industrial Recovery Act, in turn, adopted the language from Norris-La Guardia Act, passed in 1932 to prohibit federal court injunctions in ‘labor disputes’.”

 29 U.S.C.A. sec. 103. Esto es lo que se conoce como los “yellow dog contract”. Para mayor detalle sobre esta legislación, puede examinarse a A. Cox, D. Curtís Box, R.A. Gorman y M.W. Finkin, Labor Law: Cases and Materiales, 3ra ed., Nueva York, 2001, págs. 49-54.

 29 U.S.C. A. sec. 102.

 D. Fernández y C. Romany, Derecho Laboral: Casos y Materiales, Río Piedras, Ed. Universidad de Puerto Rico, 1987, T. I, pág. 32; C. Zeno Santiago y V.M. Bermúdez Pérez, Tratado de Derecho del T’abajo, San Juan, Pubs. JTS, 2003, T. I, pág. 20.

 Schechter Poultry v. U.S., 295 U.S. 495 (1935).

 29 U.S.C.A. secs. 151 y 153; E. López Ruyol, El ABC del Movimiento Obrero, Carolina, Instituto Técnico Sindical, 1998, págs. 183-184; Fernández y Romany, op. cit., pág. 33; Zeno Santiago y Bermúdez Pérez, op. cit.

 29 U.S.C.A. sec. 151; U.S. Congressional Record Senate 80, Section 1, 1947: Analysis of Title I of H.R. 3020, Taft-Harley Bill by Senator Murray 6501. Véase, además, Cox, Curtis Box, Gorman y Finkin, op. cit., págs. 87-92.

 29 U.S.C.A. sec. 157.

 Id. Véase, además, C.F. Rosado Marzán, Derecho laboral y organización sindical en Puerto Rico, 68 (Num. 1) Rev. C. Abo. P.R. 124 (2007).

 29 U.S.C.A. secs. 158(a)(1) y (b)(1), y 160(a).

 29 U.S.C.A. see. 152(9).

 Plan de Salud U.I.A. v. A.A.A., 169 D.P.R. 603, 613 (2006).

 No obstante, las formas más conocidas en que se manifiestan las actividades concertadas son: las huelgas, los piquetes, las huelgas de brazos caídos, los “sitdown”, los boicots, la resistencia a cruzar una línea de^ piquete, la presentación con-junta de querellas y otras interrupciones del trabajo. Éstas se realizan para lograr lo sigiente: (1) el reconocimiento del sindicato; (2) el adelanto de demandas económicas en la mesa de negociación; (3) la protesta contra una práctica ilícita del patrono; (4) protestar sobre las condiciones de trabajo cuestionables o (5) presionar en simpatía de otra unión fraterna que enfrente un conflicto laboral. Ante las acciones concertadas, el patrono utiliza los despidos, los reemplazos, la subcontratación, los aumentos de sueldos selectivos, incentivos a los empleados que no participan de la huelga, todo tipo de comunicaciones para divulgar la controversia y el cierre patronal. L.M. Dyal, Jr., Strikes and Other Concerted Activity, Nueva York, Practising Law Institute, 1973, pág. 45.

 M.C. Harper, S. Estreicher y J. Flynn, Labor Law: Cases, Materials, and Problems, 6ta ed., Aspen Publishers, 2007, pág. 207.

 J.R.T. v. Morales, 89 D.P.R. 777, 783-784 (1964).

 íd., págs. 779-780.

 Este caso ocurre en un contexto de organización sindical. Es decir, antes del paro y el despido, los maestros se reunieron con dos líderes sindicales para discutir el procedimiento necesario para formar una unión, acordaron organizarse bajo el nombre de Unión de Educadores de la Escuela Cooperativa Eugenio María de Hostos, eligieron una directiva, tomaron firmas entre los maestros y presentaron una petición de representación ante la Junta de Relaciones del Trabajo de Puerto Rico.

 J.R.T. v. Escuela Coop. E.M. de Hostos, 107 D.P.R. 151, 160 (1978).

 íd., págs. 160-161.

 P.R.T.C. v. Unión Indep. Emp. Telefónicos, 131 D.P.R. 171, 189 (1992); Art. II, Secs. 4 y 6, Const. E.L.A., L.P.R.A., Tomo 1; J.R.T. v. Morales, supra, págs. 779-780.

 P.R.T.C. v. Unión Indep. Emp. Telefónicos, supra, págs. 189-190.

 Art. II, Secs. 17 y 18, Const. E.L.A., L.P.R.A., Tomo 1.

 En el contexto donde ocurren estos hechos existe una campaña de elecciones sindicales en la compañía, pero la unión no había sido certificada por la NLRB y no existía un convenio colectivo.

 Labor Bd. v. Washington Aluminum Co., 370 U.S. 9, 11 (1962).

 íd., pág. 12.

 En concreto, el Tribunal Supremo federal menciona:
“The seven employees here were part of a small group of employees who were wholly unorganized. They had no bargaining representative and, in fact, no representative of any kind to present their grievances to their employer. Under these circumstances, they had to speak for themselves as best they could.... The bitter cold of January B, however, finally brought these workers’ individual complaints into concert so that some more affective action could be considered.” (Enfasis nuestro.) Labor Bd. v. Washington Aluminum Co., supra, págs. 14-15.

 Labor Bd. v. Washington Aluminum Co., supra, pág. 14.

 íd., pág. 17.

 Eastex, Inc. v. NLRB, 437 U.S. 556 (1978).

 íd., pág. 567, citando a Labor Bd. v. Washington Aluminium Co., supra, pág. 14.

 NLRB v. F. Weingarten, Inc., 420 U.S. 251 (1975).

 íd., págs. 260-261, donde se menciona el caso Houston Contractors Assn. v. NLRB, 386 U.S. 664, 668-669 (1967).

 NLRB v. Weingarten, Inc., supra, pág. 262, citando el caso American Ship Building Co. v. NLRB, 380 U.S. 300, 316 (1965).

 NLRB v. City Disposal Systems, Inc., 465 U.S. 822 829-837 (1984). El Tribunal Supremo federal fundamentó su determinación en la doctrina del caso Interboro Contractors, Inc., 157 NLRB 1295, 1298 (1966), puesto en vigor en N.L.R.B. v. Interboro Contractors, Inc., 388 F.2d 495 (2do Cir. 1967).

 Es importante mencionar que este aspecto del caso fue distinguido por la NLRB en Meyers Industries, supra, en el cual se encontró que cuando un grupo de empleados no está organizado y no existe un convenio colectivo, la afirmación de un derecho por un empleado, que sólo puede ser presumido que es de interés para el resto de los obreros, no se considera una acción concertada. Esta es la llamada interpretación literal del término “actividad concertada” que adopta la NLRB en Meyer Industries, supra. Esta norma fue revocada con el caso NLRB v. City Disposal Sys *886 tems, Inc., supra.

 NLRB v. City Disposal Systems, Inc., supra, pág. 830, refiriéndose al caso Meyers Industries, supra, págs. 493-495, para cuestionar la definición literal de “actividad concertada” que elaboró la NLRB en ese caso.

 Finalmente, el Tribunal Supremo federal reiteró que una actividad concertada puede perder la protección de la Sección 7 si el empleado actúa con impunidad y realiza la actividad concertada de forma abusiva. Crown Central Petroleum Corporation v. N.L.R.B., 430 F.2d 724, 729 (5to Cir. 1970), citado en NLRB v. City Disposal Systems, Inc., supra, pág. 837. También, si las actividades tienen objetivos ilegales, representan acciones criminales o la conducta llevada a cabo representa o contraviene la normativa existente.

 F. Velázquez, Diccionario Laboral, Master Typesetting of P.R., 1978, pág. 9.

 29 U.S.C.A. sec. 160(a); Harper, Estreicher y Flynn, op. cit., pág. 905; D.L. Gregory, The Labor Preemption Doctrine: Hamiltonian Renaissance or Last Hurrah?, 27 (Núm. 3) William and Mary L. Rev. 507, 514 (1986).

 Longshoremen v. Davis, 476 U.S. 380 (1986); Plumbers’ Union v. Borden, 373 U.S. 690 (1963); San Diego Unions v. Garmon, 359 U.S. 236 (1959); Automobile Workers v. Russell, 356 U.S. 634 (1958); United Workers v. Laburnum Corp., 347 U.S. 656 (1954). Véase, además, P.R. Telephone v. Junta Rel. Trabajo, 86 D.P.R. 382, 393-394 (1962).

 n0 obstante, los hechos de este caso son distintos a los de la controversia que está ante nuestra consideración. Inicialmente, la Sra. Isaira Rodríguez presentó ante la NLRB una querella contra un hospital, planteando que su despido se debía a su participación en actividades concertadas. El caso se transó y, posteriormente, su esposo e hijos presentaron en el tribunal de instancia una demanda por daños y perjuicios sufridos como consecuencia del alegado despido injustificado. La controversia se centró en determinar si se podía reconocer una causa de acción en daños cuando el acto alegadamente discriminatorio se refería a las actividades sindicales del empleado.

 Son cuatro las excepciones a la regla general de desplazamiento. La primera excepción es si la controversia que se plantea ante los tribunales es idéntica a la que se plantearía ante la NLRB. Sears, Roebuck & Co. v. Carpenters, 436 U.S. 180, 197 (1978). La segunda excepción se refiere a una controversia que trata sobre una conducta cuya regulación o adjudicación por los tribunales está profundamente enraizada en áreas del interés y de la responsabilidad local, y no puede inferirse que la intención del Congreso fuera removerla de la esfera estatal, por lo que la intervención judicial debe prevalecer. Belknap, Inc. v. Hale, 463 U.S. 491, 498 (1983); Sears, Roebuck & Co. v. Carpenters, supra, pág. 195; San Diego Unions v. Garmon, supra, pág. 244. La tercera excepción se concretiza cuando la conducta regulada por la ley estatal es de carácter marginal a las actividades reguladas por la NLRA. Belknap, Inc. v. Hale, supra, págs. 498-499; Farmer v. Carpenters, 430 U.S. 290, 296 (1977); Linn v. Plan Guard Worker, 383 U.S. 53, 59, 61 (1966); San Diego Unions v. Garmon, supra, pág. 243. Por último, la cuarta excepción tiene que ver con aquella conducta que es probable o razonablemente protegida por la Sección 7 de la NLRA, supra. Específicamente, el Tribunal Supremo federal indicó: “We have also acknowledged an exception for conduct that is arguably protected under § 7 where the injured party has no means of bringing the dispute before the Board.” Longshoremen v. Davis, supra, pág. 393 esc. 10. Véase, además, Sears, Roebuck & Co. v. Carpenters, supra, págs. 202-203. Esto implica que aun una conducta probable o razonablemente protegida por la NLRA puede eludir la doctrina de desplazamiento, siempre que la parte afectada no tenga medios para traer la disputa ante la NLRB.
Aunque ninguna de estas excepciones hay que aplicarlas a este caso, porque no existe una acción protegida o prohibida por la NLRA, si lo hiciéramos sería obvio que la controversia que se traería al foro judicial no sería la misma que se plantearía ante la NLRB. En el foro judicial se presentaría una acción por despido injustificado y represalias, mientras que en la NLRB se sometería una acción bajo algunas de las conductas protegidas por la Sección 7, supra, o de las prohibidas por la Sección 8 del NLRA. Esto porque la NLRB sólo puede conceder remedios de acuerdo con la NLRA. También, el interés del Gobierno de Puerto Rico en que los despidos sean justificados es una reglamentación que está profundamente enraizada en la responsabilidad gubernamental local que activaría la segunda de las excepciones a la norma general de desplazamiento que hemos anotado.

 Belknap, Inc. v. Hale, supra, pág. 498; Sears, Roebuck & Co. v. Carpenters, supra, pág. 200; Farmer v. Carpenters, supra, págs. 295-296; Machinists v. Wisconsin Emp. Rel. Comm’n, 427 U.S. 132, 139-140 y 147-148 (1976); San Diego Unions v. Garmon, supra, págs. 243-244.

 Sears, Roebuck & Co. v. Carpenters, supra, págs. 194-195; Farmer v. Carpenters, supra, pág. 296.

 San Diego Unions v. Garmon, supra, págs. 242-243. Véase, además, Rivera v. Security Nat. Life Ins. Co., 106 D.P.R. 517, 523 (1977); P.R. Telephone v. Junta Rel. Trabajo, supra, págs. 389-390.

 Longshoremen v. Davis, supra, pág. 395.
Es evidente que este pasaje, refraseado de Marine Engineers v. Interlake Co., 370 U.S. 173, 182-184 (1962), sugiei'e que la corte, primero, debe decidir si hay un caso probable o razonable de desplazamiento. De haberlo, el caso debe referirse a la Junta. De lo contrario, debe ser el Tribunal el que atienda el reclamo. En el caso Longshoremen Ass’n v. Davis, supra, el Tribunal Supremo federal desestimó la posición de la unión (International Lonshoremen Association, ILA) porque ésta no puso en condiciones a la corte de apoyar su contención. Según explica el Tribunal:
“It [ILA] does not undertake any examination of Davis’ duties as a ship superintendent. It makes no attempt to show that Davis was more like an employee than a supervisor .... It points to no evidence in the record indicating that Davis was not a supervisor. It does not argue that Davis’job was different .... Its sole submission is that Davis was arguably an employee because the Board has not decided that he was a supervisor.” Longshoremen v. Davis, supra, pág. 396.

 Longshoremen v. Davis, supra, págs. 395 y 398.

 M. Moliner, Diccionario de Uso del Español, 2da ed., Madrid, Ed. Gredos, 1991, T. I, pág. 715.

 Longshoremen v. Davis, supra, págs. 395 y 398; United Workers v. Laburnum Corp., supra, págs. 663-664. Véase, además, Rivera v. Security Nat. Life Ins. Co., supra, pág. 525.

 Longshoremen v. Davis, supra, pág. 393.

 Minuta de Reunión, Apéndice III del Alegato de la parte recurrida.

 id.

 íd.

 Apéndice de la Petición de certiorari, págs. 13 y 40.

 íd., págs. 53-54.